UNITED STATES, Appellee,

v.

Mario A. ESCOBEDO, Sergeant and
Eddie R. Guerrero, Airman, U. S.
Air Force, Appellants.

No. 34,635.
ACM 22182.

U. S. Court of Military Appeals.

May 4, 1981.

52

## OPINION OF THE COURT

FLETCHER, Judge:

The evidence of illegal drugs undergirding appellants' joint general court-martial [1] stems from factually intertwined apprehensions, searches and confessions. We are called upon in this grant of review (4 M.J. 98) to examine the sufficiency of probable cause for these apprehensions and, if any illegality is found, the taint of the entire evidence produced from the searches and confessions related thereto. Additionally, we must examine for prejudice flowing from a denial of a mutual request for severance after a failure to redact stipulated portions of confessions of each appellant. Our consideration of these issues leads us to conclude that the illegal apprehension of appellant Guerrero tainted the evidence used to convict him and requires reversal. For reasons made explicit hereafter, we are unable to conclude either that appellant Escobedo may vicariously assert this violation of Guerrero's constitutional rights or that *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), ineluctably compels relief under these facts.

I

A detailed review of this factual situation is necessary. Following a successful controlled purchase of marihuana by an informer from Sergeant Lyon, he was arrested and advised of his rights by Agent Persinger. Lyon admitted the sale and admitted giving certain marked bills to one "Bedo," a resident of the barracks. On each occasion when he purchased marihua-

---

For Appellant: *Major Gary C. Smallridge* (argued); *Colonel B. Ellis Phillips* (on brief); *Colonel Larry G. Stephens, Colonel Robert W. Norris.*

For Appellee: *Captain James R. Van Orsdol* (argued); *Colonel Julius C. Ullerich, Jr., Captain Charles Teschner* (on brief); *Colonel James P. Porter.*

1. Appellants, tried by a joint general court-martial sitting in RAF Mildenhall, England, were found guilty, contrary to their pleas, of the following offenses: Introducing nine pounds of marihuana into RAF Mildenhall, England, for purposes of use and sale; wrongfully possessing some quantity of marihuana; wrongfully selling marihuana to Sergeant Thomas Lyon; wrongfully selling marihuana to Sergeant Joseph Shelton; wrongfully selling marihuana to Sergeant Thomas Lyon. All six specifications were in violation of Article 134, Uniform Code of Military Justice, 10 U.S.C. § 934. Escobedo was sentenced to a bad-conduct discharge, total forfeitures, and reduction to Airman Basic; Guerrero was sentenced to a bad-conduct discharge, forfeitures of $270.90 pay per month until discharged, and reduction to Airman Basic. Except for rounding off Guerrero's forfeiture to $270.00 pay per month, the convening authority approved the sentences. The United States Air Force Court of Military Review approved both sentences, except Guerrero's forfeiture was reduced to $249.00 for one month.

na from "Bedo," his roommate had been present. Lyon gave the agent a physical description of both. Although Lyon did not know the room number, he knew the location and took Agent Persinger and Security Police Investigator Jenning to this room. There Persinger saw the names Escobedo and Guerrero and noted the similarity of "Bedo" to Escobedo. Guerrero answered the door and, being identified by Lyon as "the roommate," was apprehended. The agents entered the room, alleging it would not be feasible to conduct a narcotics search in the hallway. There was no consent by Guerrero to enter the room. After advisement of rights, Guerrero denied involvement in the sales, but admitted being present during Lyon's purchases from Escobedo. His person was searched, but nothing was found. Escobedo, seen leaving the latrine and attempting to leave the barracks, was apprehended in the hallway, returned to the room, searched, and found in possession of a bag of marihuana. Guerrero then produced a bag of marihuana from his drawer. The room was locked and the five went to the security police office.

Information concerning the operation was given to the base commander, who gave verbal permission to search the room. The commander authorized a search for the marked bills, marihuana and paraphernalia. Later, the commander signed an authorization to search and a formal search warrant.

Returning with Escobedo and with a limited search warrant, Persinger and other agents searched the room. Seizing clothing bearing Escobedo's name tag, he found the marked bills and two checks, one of which was a signed draft with the payee blank. Also seized were marihuana butts, scales and certain other items on a table.

Returning to Headquarters, Persinger initiated another interview after advising Escobedo of his rights. Escobedo confessed to the sale to Lyon and also informed the agents of the location of marihuana on a C–130 aircraft. Appellant Escobedo accompanied the agents to the aircraft and, after being readvised of his rights, showed them the location of three packages of marihua-

na. While there, Escobedo told Persinger of another stash of marihuana in a latrine. In the barracks after another advisement of rights, Escobedo produced a paper bag filled with 14 individual bags of marihuana. At the security police headquarters, after lunch and readvisement of rights, Escobedo confessed to other facts which were reduced to prosecution exhibit 21.

Earlier at the security police office, Guerrero, waiving his rights, made a written statement, but denied participation with Escobedo in sales. During the search of their room, Agent Persinger observed an envelope directed to Guerrero. This he seized and scanned. Confronting Guerrero with this information in a second interrogation after advisement of rights, Guerrero admitted a greater involvement and executed prosecution exhibit 20.

■ The first legal question to be answered is whether the agents had sufficient probable cause to apprehend Guerrero. Appellate defense counsel urges that there was not, citing *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); *Rios v. United States*, 364 U.S. 253, 80 S.Ct. 1431, 4 L.Ed.2d 1688 (1960); *Henry v. United States*, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959); *Johnson v. United States*, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948); and *United States v. Di Re*, 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210 (1948). Contrariwise, the Government seems to argue that as Lyon had given information that Guerrero was always present, it is therefore reasonable to assume his participation, thus supplying probable cause.

Probable cause exists where "the facts and circumstances within their knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that" an offense has been or is being committed. *Brinegar v. United States*, 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1310–11, 93 L.Ed. 1879 (1949), quoting *Carroll v. United States*, 267 U.S. 132, 162, 45 S.Ct. 280, 288,

69 L.Ed. 543 (1925). The law is well-settled that mere presence of a person on premises which law officers have reason to believe are being used for criminal activities does not in itself constitute probable cause for an immediate arrest. *United States v. Di Re, supra; United States v. Branch,* 545 F.2d 177 (D.C.Cir.1976); *United States v. Rodriguez,* 525 F.2d 1313 (10th Cir. 1975); *Arellanes v. United States,* 302 F.2d 603 (9th Cir. 1962); *Banks v. Pepersack,* 244 F.Supp. 675 (D.Md.1965). "Guilt [may] not be established by mere association." *Diaz-Rosendo v. United States,* 364 F.2d 941, 944 (9th Cir. 1966); *see United States v. Myers,* 20 U.S.C.M.A. 269, 43 C.M.R. 109 (1971); *United States v. Mehalek,* 42 C.M.R. 744 (A.C.M.R.1970). Other factors must reasonably establish that such a person manifested sufficient participation in the criminal activities. *United States v. Chadwick,* 532 F.2d 773 (1st Cir. 1976), *aff'd. on other grounds,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977); *Holloway v. Wolff,* 482 F.2d 110 (8th Cir. 1973); *United States v. Bazinet,* 462 F.2d 982 (8th Cir. 1972), *cert. denied,* 409 U.S. 1010, 93 S.Ct. 453, 34 L.Ed.2d 303 (1972); *United States v. Williams,* 325 F.Supp. 1283 (S.D.N.Y.1971). It is also well established that association with known or suspected criminals does not, in itself, establish probable cause. *Sibron v. State of N. Y.,* 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968). Finally, it has been held that a person being arrested must be "a participant" in the crime and not "merely a knowing spectator." *United States v. Garguilo,* 310 F.2d 249, 254 (2d Cir. 1962).

■ The principal evidence leading to Guerrero's apprehension consisted of testimony from Lyon that Guerrero was present in the room during various drug transfers. No evidence suggested that the roommate was anything more than a mere spectator to the drug transactions. Accordingly, there was insufficient probable cause to apprehend Guerrero.

The Government has, in this instance, failed to show any probable cause to arrest Guerrero and, in fact, made no attempt to obtain a warrant to enter his barracks room to accomplish Guerrero's arrest; and furthermore, has not made any assertion before us nor below that these actions were compelled by a set of exigent circumstances. It is clear, therefore, that the instant apprehension was illegal.[2]

■ We turn then to the effect of the illegal apprehension of Guerrero on the incriminating evidence used to convict him.

---

**2.** Appellate defense counsel alleged in his oral argument a violation of Guerrero's constitutional protection from a warrantless entry into his barracks room in order to arrest him. The Fourth Amendment to the Constitution protects both the basic right of freedom from unreasonable searches and seizures and also requires that warrants be particular and supported by probable cause. "Unreasonable searches or seizures conducted without any warrant at all are condemned by the plain language of the first clause of the Amendment .... [ʼ] The simple language of the Amendment applies equally to seizures of persons and to seizures of property." *Payton v. New York,* 445 U.S. 573, 585, 100 S.Ct. 1371, 1379, 63 L.Ed.2d 639 (1980). The constitutional protection provided to the interest of privacy in one's home is extended to a warrantless entry for the object of arresting a person as a search for the suspect may be required before his apprehension. *Dorman v. United States,* 435 F.2d 385 (D.C.Cir.1970). The Supreme Court in *Payton v. New York, supra* 445 U.S. at 588–89, 100 S.Ct. at 1381–82, found the following reasoning of the Second Circuit persuasive:

"To be arrested in the home involves not only the invasion attendant to all arrests but also an invasion of the sanctity of the home. This is simply too substantial an invasion to allow without a warrant, at least in the absence of exigent circumstances, even when it is accomplished under statutory authority and when probable cause is clearly present." *United States v. Reed,* 572 F.2d 412, 423 (C.A.2 1978), *cert. denied sub nom. Goldsmith v. United States,* 439 U.S. 913, 99 S.Ct. 283, 58 L.Ed.2d 259.

The High Court, thus, enshrines the "respect for the sanctity of the home that has been embedded in our traditions since the origins of the Republic" and holds that absent exigent circumstances the police may not enter a home to arrest without a warrant. *Id.* at 601, 100 S.Ct. at 1387. While there is evidence of record that Guerrero may have been arrested in the doorway of his room, because of the lack of probable cause to arrest him in any event, we find it unnecessary to rule on whether a barracks room arrest would be proscribed under *Payton v. New York, supra.*

At trial this consisted of the following items: the bag of marihuana Guerrero produced from his drawer while arrested and a stipulated portion of his confession. During the limited search authorized by the commander, the agent illegally perused a letter written by Guerrero. This information was used to confront him during his illegal apprehension after he had already executed a written statement. It is true that Article 31, 10 U.S.C. § 831 warnings were given him before the confrontation with the illegally obtained information in the letters, just before his execution of prosecution exhibit 20. It will be remembered that, likewise, he had been adequately warned before he produced the bag of marihuana while under illegal apprehension. In order to resolve this matter, we turn to the Supreme Court's analysis in *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). There the appellant was "seized" in the Fourth Amendment sense, although not under arrest, and taken involuntarily to the police station. Interrogated there, he ultimately waived counsel and eventually made statements and drew certain sketches that incriminated him in the crimes. The State conceded on appeal that the police lacked probable cause to arrest the appellant before his incriminating statement during the interrogation. The Court concluded that the treatment of Dunaway under the facts of that case was not supported by probable cause. It then examined whether, notwithstanding the unconstitutional police conduct, the incriminating statements were "sufficiently attenuated" as to be useable at trial. *Id.* at 216, 99 S.Ct. at 2258. *See Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *Nardone v. United States*, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939); *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920).

■ *Miranda*[3] warnings had been given and appellant had conceded that the statements were voluntary for Fifth Amendment purposes; yet this was not sufficient to overcome a Fourth Amendment viola-

tion. *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). The Court in *Dunaway v. New York, supra,* applied *Brown*'s mandate and held that:

> [w]hen there is a close causal connection between the illegal seizure and the confession, not only is exclusion of the evidence more likely to deter similar police misconduct in the future, but use of the evidence is more likely to compromise the integrity of the courts.

442 U.S. at 218, 99 S.Ct. at 2259.

■ There is no *per se* rule that *Miranda* warnings break the effect of unconstitutional custody unless such custody is voluntary under the facts of the case. The burden of showing the admissibility of in-custody statements of persons illegally arrested rests with the prosecutor. *Brown v. Illinois, supra.*

> If *Miranda* warnings, by themselves, were held to attenuate the taint of an unconstitutional arrest, regardless of how wanton and purposeful the Fourth Amendment violation, the effect of the exclusionary rule would be substantially diluted. *See Davis v. Mississippi*, 394 U.S. 721, 726–727, 89 S.Ct. 1394, 1397, 22 L.Ed.2d 676 (1969).

*Brown v. Illinois, supra* 422 U.S. at 602, 95 S.Ct. at 2261. Thus, we are compelled to conclude that neither Guerrero's confession nor the production of the bag of marihuana was voluntary and could not be attenuated of taint merely by preceding them with adequate Article 31 warnings.

■ We turn then to the effect of these illegalities on the other joint appellant, Escobedo. Even if the apprehension of Guerrero was not based upon probable cause and the entry into appellants' room to effect *that* apprehension was not justified, it does not follow that the entry was illegal as to Escobedo. One Agent testified that he could not tell if Sergeant Escobedo was in the room when Airman Guerrero came to the door, but that it was his intention to apprehend both men at that time. Escobedo was actually apprehended after being returned from the barracks latrine.

**3.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Clearly, there was probable cause to apprehend Escobedo flowing from Lyon's information. Thus, the visit of the government agents to the barracks room was at least justified for the purpose of attempting to apprehend Escobedo. With respect to Escobedo, the apprehending authorities were properly on the premises when they noticed marihuana related paraphernalia in plain view and could properly include their observation of such in the information furnished the commander as a basis for probable cause to search the premises.

Thus, there was more than sufficient probable cause, exclusive of the information concerning paraphernalia, to authorize a search for the Pound-Sterling Notes and marihuana. Once properly on the premises to search for these items, the agents were then entitled to seize the paraphernalia as items in plain view without regard to whether they were specified in the search authorization. Hence, their ultimate seizure and admission into evidence against Escobedo was lawful.

■■■ Inasmuch as Guerrero's arrest was illegal and tainted the evidence leading to his conviction, can Escobedo vicariously assert these violations under the Fourth and Fifth Amendments? As to the Fifth, *United States ex rel. Falconer v. Pate*, 319 F.Supp. 206, 210–11 (N.D.Ill.1970), is dispositive of this issue. The Court said:

> We conclude that the confrontation between Doss and petitioner, even if assumed violative of *Miranda*, raises no constitutional deprivation to petitioner; any such deprivation that may have occurred was personal to Doss and may not be complained of by petitioner.

Fourth Amendment rights are personal and may not be vicariously asserted. *United States v. Salvucci,* 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980); *Brown v. United States*, 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973), *Alderman v. United States*, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969). The principle was stated in *Wong Sun v. United States, supra* 371 U.S. at 492, 83 S.Ct. at 419:

The exclusion of the narcotics as to Toy was required solely by their tainted relationship to information unlawfully obtained from Toy, and not by any official impropriety connected with their surrender by Yee. The seizure of this heroin invaded no right of privacy of person or premises which would entitle Wong Sun to object to its use at his trial. (Citation omitted.)

Escobedo's apprehension was legally performed and he cannot now claim a violation of Fourth and Fifth Amendment rights by proxy.

## II

This case was a joint trial where pretrial confessions had been made by both defendants. These confessions were not given to the jury directly; rather an attempted avoidance of *Bruton v. United States, supra*, was effectuated by defense stipulations to edited versions of the original confessions. Neither accused testified during the course of the trial and the stipulated confessions were corroborated by the testimony of witnesses for the prosecution.

The record details the presentation of these confessions. Initially the two confessions were offered as evidence for identification prior to admission into evidence. At this juncture the trial counsel had not masked all references by one defendant to the other, nor did he intend to. The military judge indicated in his comments that he considered the confessions to be interlocking and mutually supportive. Both defense counsel objected to their introduction.

The military judge proceeded, offering to mask references to uncharged misconduct and offering cautionary instructions on the uncharged misconduct. Both defense counsel objected and moved for severance, which was denied. Subsequently, a colloquy occurred where the trial counsel informed the military judge that the defense and prosecution had agreed to delete certain portions of the confessions. Counsel for Guerrero objected to the portion of his statement involving other criminal misconduct. The military judge overruled counsel, but stated

that he would instruct on the misconduct. Escobedo's counsel objected that Guerrero could not be cross-examined on this subject. Other objections were made and also overruled.

Later in the proceedings, after some discussion of how the confessions could properly be masked, each accused agreed to a stipulation of fact of a limited portion of his original confession, in lieu of masking the original statements. Guerrero's counsel mentioned his client's concern that masking would raise questions in the minds of court members and be prejudicial to Guerrero. The stipulations were read aloud and given to the members. Thereafter the military judge instructed (*inter alia*):

> You are advised that *when counsel for both sides with the express consent of the accused stipulate and agree as to facts or the contents of a writing, the parties are bound by the stipulation and the stipulated matters are evidence to be considered by you in this case along with all other evidence in the case.*
>
> \* \* \* \* \* \*
>
> *However, you will note that there is language in each of these out-of-court statements which may implicate the other accused. Such language which may implicate the other accused must be completely disregarded by you with respect to that other accused. In other words, an out-of-court statement may be considered by you in determining the guilt or innocence of the maker of the statement by him only. Language contained in these out-of-court statements which may implicate the other accused may not be considered by you in determining the guilt or innocence of this other accused, that is, the non-maker of the statement.*

(Emphasis added.)

Guerrero's original confession, prosecution exhibit 20, and Escobedo's original confession, prosecution exhibit 21, were admitted in evidence. The two stipulated confessions denominated prosecution exhibits 28 and 29, were also received in evidence.

The rule in *Bruton v. United States, supra,* applies to courts-martial.[4] *United States v. Green*, 3 M.J. 320 (C.M.A. 1977), and *United States v. Pringle*, 3 M.J. 308 (C.M.A.1977). The holding in *Bruton* overruling *Delli Paoli v. United States*, 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed.2d 278 (1957), considers that a confession by a co-accused is unlikely to be ignored by the jury; hence cautionary instructions insufficiently protect accused's Sixth Amendment right to confrontation where the co-accused is not subject to cross-examination. Cited is *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), noting cautionary instructions cannot always be curative. Furthermore, paragraph 140*b*, Manual for Courts-Martial, United States, 1969 (Revised edition), calls for effective deletion of a co-accused's name. The American Bar Association's Standards Relating to the Administration of Criminal Justice, contained in ABA Standards, Joinder and Severance § 2.3(a) (1968), does not require all inculpatory references be "effectively deleted," but rather that the statement "as deleted ... will not prejudice the moving defendant."

The standard provides that the prosecuting attorney is to elect one of three courses when the defendant moves for a severance because an out-of-court statement of a codefendant makes reference to him but is not admissible against him. This does not mean that it is for the prosecutor to decide, when he elected joint trial with an edited version of the statement, that the statement can be edited as required by section 2.3(a)(ii). This is a matter for the court to pass upon, and if the court rules that the requirements of section 2.3(a)(ii) cannot be met, then the prosecutor would have to elect one of the two remaining alternatives: "a joint trial at which the statement is not admitted into evidence; ... or severance of the [implicated] defendant."

The facts of this case show an attempt to comply with the *Bruton* rule elucidated in

---

4. We note that the "interlocking confession" exception to *United States v. Bruton*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), may conflict with paragraph 140*b* of the Manual for Courts-Martial, United States, 1969 (Revised edition), which was then in effect.

*United States v. Green, supra,* and *United States v. Pringle, supra,* not by redaction of the confessions but by limiting the confessions by stipulation of a portion of them. At an early point in this case, after the judge made clear his intention not to either sever or to redact, counsel objected to introduction of the confessions and then moved for severance. These motions were denied.

Do these stipulations qualify as out-of-court statements under *United States v. Green, supra* and *United States v. Pringle, supra* and the ABA Standards? Our answer is yes, because the stipulations on their face refer to themselves as stipulations of fact and include written out-of-court statements regarding involvement in the matter under investigation.

Turning to the statements, we see that they are interlocking in the overall plan to sell marihuana and each makes reference to certain sales individually accomplished without reference to the other. We believe this case to be governed by the conclusion reached in *Parker v. Randolph*, 442 U.S. 62, 73, 99 S.Ct. 2132, 2139, 60 L.Ed.2d 713 (1979), where the plurality observed:

> [T]he incriminating statements of a codefendant will seldom, if ever, be of the "devastating" character referred to in *Bruton* when the incriminated defendant has admitted his own guilt. The right protected by *Bruton*—the "constitutional right of cross-examination," *id.,* [391 U.S.] at 137 [88 S.Ct. at 1628]—has far less practical value to a defendant who has confessed to the crime than to one who has consistently maintained his innocence. Successfully impeaching a codefendant's confession on cross-examination would likely yield small advantage to the defendant whose own admission of guilt stands before the jury unchallenged. Nor does the natural "motivation to shift blame onto others," recognized by the *Bruton* Court to render the incriminating statements of codefendants "inevitably suspect," *id.,* [391 U.S.] at 136, [88 S.Ct. at

1628] require application of the *Bruton* rule when the incriminated defendant has corroborated his codefendant's statements by heaping blame onto himself.

Even though we have ruled that Guerrero's stipulated confession was tainted and improperly admitted, we see no prejudice to appellant Escobedo, as his stipulated admission of guilt stands before the general court-martial members unchallenged. The facts of the instant case, as in *Parker v. Randolph, supra* show that the stipulated confessions as admitted here with instructions tip the constitutional scales in favor of the premise that the members have followed the military judge's instructions and no violation has occurred to Escobedo's rights under the confrontation clause.

As has been elucidated in this opinion, relief is warranted for appellant Guerrero in light of his illegal arrest and its taint of the evidence used to convict him.

The decision of the United States Air Force Court of Military Review as to Sergeant Escobedo is affirmed.

The decision of the United States Air Force Court of Military Review is reversed as to Airman Guerrero. The findings and sentence as to him are set aside. Airman Guerrero's record of trial is returned to the Judge Advocate General of the Air Force. A rehearing may be ordered.

Chief Judge EVERETT concurs.

COOK, Judge (concurring in part and dissenting in part):

I agree with the principal opinion's disposition of Escobedo's claim of error and with affirmance of the decision of the Court of Military Review as to him. I disagree with the disposition of Guerrero's assignments of error, and I would affirm the Court of Military Review's decision also as to him.

Although I disagree with the principal opinion's conclusion that no probable cause existed for Guerrero's apprehension, I accept it as the starting point for decision.[1] I

---

1. Before Guerrero's arrest, Agent Persinger had learned that several kilos of marihuana had been brought onto RAF Mildenhall in an Air Force plane by "TDY personnel" from a Texas base, who were housed in BRAVO Squadron Barracks at Mildenhall. He had also been in-

conclude, however, that the evidence of guilt admitted against Guerrero was not tainted by the illegality of his apprehension.

Only three items of evidence were admitted against Guerrero, but five must be considered. Two items of the three admitted consist of statements made by Guerrero disclosing his possession of a "little bit of grass" and his delivery of a bag of marihuana to Agent Persinger; the statements and the delivery were made in Guerrero's room, 10 to 15 minutes after Escobedo's apprehension, which occurred at about 2130 hours, May 18th. The third admitted item is the stipulation incorporating a *Bruton*[2]-sanitized version of Guerrero's second handwritten pretrial statement, which resulted from an interrogation begun at about 0500 hours, May 19th. The first of the two unadmitted items is the letter by Guerrero, which was seized by Agent Persinger during the authorized search of Guerrero's room from about 0008 to 0045 hours, May 18th; the letter was considered only for its impact on Guerrero's second handwritten statement and is appended to the record of trial as Appellate Exhibit V. The second unadmitted item is Guerrero's first handwritten pretrial statement, which resulted from an interrogation begun a few minutes after midnight on the night of Guerrero's apprehension. After the trial judge considered and rejected a defense challenge to the admissibility of this statement, trial counsel indicated he would not offer it into evidence; it appears in the record as Prosecution Exhibit 19 for identification. I shall consider each in its chronological sequence.

## I. GUERRERO'S DECLARATIONS OF POSSESSION OF MARIHUANA AND HIS DELIVERY OF A BAG OF MARIHUANA TO AGENT PERSINGER.

Four persons testified to the circumstances surrounding Guerrero's declarations of possession and the delivery of a bag of marihuana to Agent Persinger. They were: Agent Persinger and Security Police Investigator Jennings for the Government; Sergeant Lyon and co-accused Escobedo for the defense. In my opinion, the testimony of all establishes that Guerrero's statements and action were entirely voluntary and so separate from Guerrero's apprehension as to justify a finding that they did not result from the government's exploitation of Guerrero's apprehension.

Immediately after his apprehension, Guerrero was searched. Nothing incriminating was found. Persinger advised Guerrero of his right to remain silent and his right to counsel. According to Investigator Jennings, Guerrero "gave ... all the indications that he was willing to talk" and "[h]e didn't request legal assistance." Persinger stated Guerrero acknowledged that "he understood his rights"; that when asked if he would be "willing to discuss this matter," he indicated he was willing to give up the right "to remain silent and was willing to discuss the situation"; and that, when asked if he wanted a lawyer, he replied "that he was not involved" and "he didn't need an attorney." Sergeant Lyon confirmed that Persinger advised Guerrero of

---

formed that Sergeant Lyon was "selling ... marijuana for some people in BRAVO Squadron." When, following the drug purchase from Lyon, Persinger determined that Lyon did not have the marked British currency that had been given him, he asked what Lyon had done with the marked bills. Lyon told him he had given them to his drug supplier, Escobedo, whom he then knew as "Bedo." He also told Persinger he had obtained marihuana from Bedo, in Bedo's room, several times, and "on all occasions" Bedo's roommate, Guerrero, "was present during those transactions." Both Escobedo and Guerrero were TDY personnel from Dyess Air Force Base, Texas, and they occupied Room 10 in BRAVO Barracks # 402.

Their names were on the name tags outside the door to the room. Agent Persinger testified that recovery of the marked money was an "important part of the investigation," and he believed that "time was of the essence" if it was to be recovered. Accordingly, with Lyon, he proceeded immediately to Bedo's room. When he saw Escobedo's name outside the door, he identified it with the nickname used by Lyon. In my opinion, these circumstances support the judge's overruling of Guerrero's challenge to the legality of his apprehension.

2. *United States v. Bruton*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

his rights; and he could not "honestly say" that Guerrero asked for a lawyer.

Persinger questioned Guerrero about his knowledge of the presence of marihuana. Sergeant Lyon testified that Guerrero kept "just denying it, the fact that he didn't know." Agent Persinger testified more fully on the point. He said Guerrero admitted he recognized Sergeant Lyon; that he had seen Lyon in the room on a number of occasions; and that he knew Lyon had "made purchases of grass" from Escobedo; but "[h]e adamantly denied any involvement" in those transactions.

The questioning of Guerrero as to his knowledge of the source of Escobedo's marihuana apparently continued in a pattern of question and denial for about 5 or 10 minutes. Then, Sergeant Escobedo "put his head in" the room and asked "if . . . [*Escobedo*] was in the room"; and "Guerrero said, 'No, he isn't here.'"[3] Escobedo left. Thereupon, Persinger asked Lyon if the inquirer was Escobedo; Lyon did not answer, but Guerrero said that the person was Escobedo.

At Persinger's direction, Investigator Jennings pursued Escobedo and brought him back to the room. Jennings informed Escobedo he was under apprehension and searched him. Inside a trouser pocket, Jennings found a bag of marihuana, but the marked money given to Escobedo by Sergeant Lyon was not on Escobedo's person.

Advised of his right to remain silent and right to counsel, Escobedo admitted he understood his rights and he did not want a lawyer. Agent Persinger then told him about "the controlled buy" from Sergeant Lyon and asked questions, including some as to Escobedo's source for the marihuana Lyon said he had obtained from him. Escobedo refused to answer the questions. In his testimony as to the position he took at that time in regard to the investigation, Escobedo stated that all he would say was, " 'You have a bag of marijuana there, and

you found this on me.' " Guerrero, however, repeated his admission that he had been present on all occasions when Lyon had been in the room and "marijuana was sold" by Escobedo.

According to Persinger, during further fruitless questioning of Escobedo, Guerrero interjected a remark to the effect that he had a "stash" and he wanted Persinger "to have it." That this statement and Guerrero's later action in turning over a bag of marihuana to Persinger were wholly independent of the fact of Guerrero's apprehension appears in the testimony of all four witnesses.

1. *Persinger*

Q. [Trial counsel]. Now, you indicated a number of questions during the time after Sergeant Escobedo's apprehension were not directed at him [Guerrero]. Can you tell us exactly what was transpiring at that time?

A. [D]uring the line of questioning on Escobedo at that time, he verbally told me that he had a stash in the room and he wanted me to have it; and on two or three separate occasions when he made this known to me, I told him not to make any reference to any subsequent marijuana in the room. However, after --- 

. . . . .

MJ: Let me interrupt you here. Who was it you said was making representations that there was a stash in the room?

Wit: Guerrero.

MJ: All right. And --- 

Wit: His stash, he referred to this as.

MJ: Okay. When Guerrero again told you that he was present when sales had taken place and recognized Lyon, and so forth, was this in the presence of Escobedo?

Wit: Yes, sir.

MJ: All right. Go ahead.

---

3. Questioned by the trial judge as to whether "Escobedo asked if Escobedo was there," Sergeant Lyon responded in the affirmative. Earlier, Lyon had volunteered that he thought that, as Escobedo had seen "two strangers" in the room, "things didn't look right" to Escobedo and, therefore, he asked the question.

Q. [Trial counsel]. Could you complete what you were telling us in regards to this?

A. Guerrero kept mentioning—he said, "My only involvement is I've got a little bit of grass in the room." This is his terminology. And I said, "I'm not asking you any questions about any possession in the room right now"; but on two different occasions he made reference to it, and I think on the third occasion he made reference to it he went immediately to his dresser drawer, or which he identified as his dresser drawer, and pulled out a bag containing green vegetation, which appeared to be marijuana. And he said, "This is my stash; it's all I've got and I want you to have it." At that point, I readvised Guerrero again of the offense of possession of marijuana and went through the full 31 advisements, and then he acknowledged that that was his grass again, after the advisements, and again he declined to have an attorney, but he was willing to answer my questions.

.    .    .    .    .

Q. Did you ascertain if he was willing to discuss this new allegation with you?

A. He was willing to answer my questions. However, I didn't question him to any extent at that point.

Q. Just to make it clear for the record, you say that Airman Guerrero went to the dresser and removed the item himself?

A. Yes.

2. *Investigator Jennings*

Q. [Trial counsel]. Prior to that time [leaving to obtain transportation to take Guerrero and Escobedo to Security Police Headquarters], did you see any other substance you thought might have been marijuana?

A. Right. Well, prior to that Airman Guerrero removed a small quantity of vegetable green substance from a drawer—from the top drawer, which

was positioned to his left. He removed it from the dresser drawer and handed it to Special Agent Persinger.

Q. Had Special Agent Persinger applied any pressure to Airman Guerrero to surrender marijuana at that time?

A. No, sir.

Q. How did this particular event come about?

A. He appeared that he was very interested to give it to him. That's the indication he gave me.

Q. Did he say anything at the time he produced this marijuana?

A. He said something to the effect, this is his stash or something of this nature.

Q. And, again, where was it produced from?

A. From the top dresser drawer.

Q. About how long after you completed the search of Sergeant Escobedo did this take place?

A. Well, it was a matter of ten to fifteen minutes.

3. *Sergeant Lyon*

MJ: Let me just take you back to where I think you said Guerrero said, "You're going to find it anyway," or something to that effect.

Wit: Yes.

MJ: All right. Could you start there and explain what happened again?

A. Like I said, the OSI just kept persisting, you know—"We know you've got some; let's see it." And they stated, "Well, if you show us now and if you help us, we can make it go easier on you." Airman Guerrero said a couple of times, you know, "If I show you, if I give it to you, you know, will you let me off?" And they said, you know, "Well, no we can't do that." So subsequently he gave them the ounce that he had, that was in the dresser.

Q. What was the comment that he made at that time?

A. What, before?

Q. Yes.

A. Something to the effect, "Well, you know, when you search you're going to find it, so here it is."

Q. Now, do you recall whether or not Airman Guerrero and Sergeant Escobedo were advised of their rights?

A. Yes, sir, they were.

4. *Sergeant Escobedo*

Q. [Guerrero's defense counsel]. Sergeant Escobedo, do you recall, after your apprehension, whether Airman Guerrero at any time stated anything with respect to a lawyer?

A. Well, at one time, when Persinger asked if there was anymore pot in the room, and Guerrero pulled that pot out of the drawer and gave it to him, Persinger then read rights, I presume it was to both of us, because he had no—even though Guerrero did give him the pot, I presume he didn't know whose it was, because all Guerrero did was pull it out of a dresser drawer in the room.

Q. [Trial counsel]. Now, this [Agent Persinger's repetition of a reading of rights] was right after Airman Guerrero produced a bag of marijuana from a drawer?

A. Yes.

Q. Did he seem to know what he was doing at that time?

A. Yes, he was responding to Mr. Persinger—or Agent Persinger's question.

Q. But he knew he was producing marijuana?

A. I don't know if he knew he was producing marijuana.

Q. Did it look like a mistake?

A. Like a what?

Q. Like a mistake.

A. If you want my personal opinion—Is that what you want?

Q. Yes.

A. I don't think it was a mistake.

Q. So apparently he deliberately obtained the marijuana and produced it?

A. I presume.

Obviously, there are differences in the account each witness gave of Guerrero's statements and action. The unmistakable common theme, however, is that the agents did not use Guerrero's apprehension to get him to declare his possession of marihuana and to retrieve the bag from his dresser drawer. On the contrary, the totality of the evidence on the matter compels the conclusion that Guerrero decided on his own to distance himself from Escobedo and to portray himself as a small marihuana user and Escobedo as a major marihuana seller. I am convinced, beyond reasonable doubt, that Guerrero's apprehension did not taint his declarations and his action in delivering a bag of marihuana to Agent Persinger. Consequently, his statements and the bag of marihuana were properly admitted into evidence against him.

II. GUERRERO'S FIRST POST–APPREHENSION STATEMENT TO OSI AGENTS.

After their apprehension, Guerrero and Escobedo were taken to Security Police Headquarters. Agent Persinger telephoned the base commander and obtained oral authorization to search the accused's room for marihuana, related paraphernalia, and the marked money that Lyon had said he had given to Escobedo. Agent Persinger, other agents, and Escobedo then returned to the room. They arrived at about 8 minutes after midnight. The search ended at 0045 hours, May 19th. Among other things, the agents discovered the marked money in a fatigue shirt bearing Escobedo's name, and Agent Persinger opened, and "scanned," a sealed letter apparently written by Guerrero to a person in Abilene, Texas. I shall refer later to the contents of the letter.

Guerrero remained at police headquarters. Beginning a few minutes after midnight, Agent Dougherty interviewed him. Agent Simmons was also present. After

full advice as to his rights and his waiver of them, Guerrero was orally questioned for about 20 minutes. He then prepared a handwritten statement. The interview was concluded at 2:00 a. m. At that time, Guerrero was left alone in the office, which had a couch, and Dougherty told him he could sleep there. During the interview, neither Dougherty nor Simmons knew of the seizure of Guerrero's letter.

Guerrero's statement was Prosecution 19 for identification. Guerrero's lawyer challenged its admissibility on two grounds, one of which was that it was tainted by the illegal apprehension of Guerrero.[4] Both objections were overruled. At that point, trial counsel indicated that he would not offer the statement into evidence. As the Court now holds that Guerrero's apprehension was illegal, the question of taint must be reconsidered.

I perceive Guerrero's statement as an integral part of his endeavor to establish himself as merely a small user of marihuana, not a pusher as he indicated Escobedo was. Thus, in the statement, he said his "first use" of marihuana was at Kelly Air Force Base, Texas, when a staff sergeant gave him some. Thereafter, he did not "use grass on a regular" basis, but when he became friends with Escobedo, who was from his hometown, he "smoked with him on a few occasions." He insisted he did "not know where ... [Escobedo] purchase[d] his grass." He acknowledged again he was present at sales Escobedo made in their room, and he again denied knowledge of where Escobedo's "grass was hid at." However, he added new detail to his knowledge of the scope of Escobedo's drug activity. He disclosed that, on the flight from Dyess Air Force Base, Texas, to England, Escobedo told him he had concealed two "bricks of grass" in the aircraft, and that, on arrival, at Escobedo's request, he removed one brick, brought it to their room, and helped Escobedo "break [it] down" into 36 bags of marihuana. In his

closing remarks in the statement, Guerrero maintained that he had been "very cooperative with the O.S.I. investigation."

I am convinced beyond a reasonable doubt that, while the statement might not have been made "but for" the fact that Guerrero had been illegally apprehended, it was not "come at by exploitation of that illegality" and, is, therefore, untainted and outside the scope of the exclusionary rule. *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963). As the statement was not illegally obtained, its later use did not poison Guerrero's second statement.

### III. THE LETTER SEIZED BY AGENT PERSINGER AND ITS INSIGNIFICANCE IN REGARD TO THE STIPULATION INCORPORATING GUERRERO'S SECOND STATEMENT.

As remarked earlier, in the search of Guerrero's room, Agent Persinger found a sealed letter, apparently written by Guerrero. He opened the letter, and quickly "scanned" the writing. He took note of a passage that said "I got 36 lids out of the key," and expressed the hope to "sell a few lids tonight." At the suppression hearing the trial judge ruled the letter inadmissible because it was not within the search authorization and no independent probable cause justified its seizure. *See United States v. Hendrix*, 21 U.S.C.M.A. 412, 45 C.M.R. 186 (1972). However, the judge rejected defense counsel's contention that the letter was used to obtain Guerrero's second statement.

Review by this Court of a trial judge's ruling on the legality of a search is limited. Unlike a Court of Military Review, we cannot make new findings of fact. We cannot, therefore, weigh various items of evidence differently from the trial judge or, from personal preference, credit the testimony of one witness over that of another believed by the judge. Nor can we disregard a

---

4. The second ground of objection was an allegation that Guerrero had requested counsel during the questioning in his room, and the request had been improperly ignored. The trial judge overruled the objection. I am satisfied that ample evidence supports that ruling.

reasonable inference drawn by the trial judge from a fact in evidence because we may believe another inference is allowable. We can only scrutinize the evidence to determine whether the findings of fact inherent in the trial judge's ruling are supported by sufficient evidence.

My Brothers overturn the trial judge's ruling but say nothing of the evidentiary deficiencies they perceive. My reading of the record convinces me that substantial evidence supports the trial judge's ruling that the government's later use of the letter did not so taint Guerrero's second statement as to require that it, too, be excluded from evidence.

Considerable testimony was taken as to the events that occurred before Agent Persinger confronted Guerrero with the letter. I am satisfied that the trial judge found that Persinger appeared with the letter at Guerrero's second interrogation only after Guerrero had already implicated himself both in the introduction of marihuana onto RAF Mildenhall as charged in specification 1, and in sales of marihuana, as charged in the remaining specifications of the Charge. Further, I am satisfied that the letter pertained to a matter so incidental to the offenses charged that the court members were not influenced in their findings of guilty by the evidence obtained through exploitation of the letter.

A. *Persinger did not appear at Guerrero's second interrogation until after Guerrero had implicated himself in the sales of marihuana.*

As the principal opinion considers not only Persinger's confrontation of Guerrero with the seized letter, but also the "effect" of Guerrero's "illegal apprehension," I first note my disagreement with that approach to the issue. The repeated advice Guerrero received as to the right to remain silent and the right to counsel, and Guerrero's repeated refusal to exercise those rights are not, as the majority maintain, the only circumstances that stand between the apprehension and Guerrero's second written statement. I have already pointed out that,

in my opinion, neither Guerrero's statements at the time of his apprehension nor his first handwritten statement to Agents Dougherty and Simmons were obtained through exploitation of his apprehension. I need simply say, therefore, the totality of the evidence convinces me beyond a reasonable doubt that the Government did not use Guerrero's apprehension to obtain his second written statement. What remains is the effect of the seizure of the letter on that statement.

All of Guerrero's admissions before his second interrogation concerned possession and use of marihuana. As noted earlier, in the first statement Guerrero admitted that at Escobedo's request he removed a brick of marihuana from the aircraft, brought it to their room, and helped Escobedo "break" it down to 36 individual bags. However, Guerrero persisted in his denial that he "help[ed] Escobedo in sales of grass" and in his previous representations that he did not know where Escobedo's "grass was hid at." Appreciative of the significance of Guerrero's admissions as to possession and use of marihuana and of his aid to Escobedo in effectuating its introduction into the base, Guerrero's lawyer challenged the admissibility of the letter on the ground that it constituted the first "evidence that . . . [Guerrero] had been involved in selling," and that "Guerrero's subsequent admissions concerning his sales, when he previously denied it, were . . . a product of the use of that letter." The crucial question, therefore, is not whether Guerrero was confronted with the letter during his second interrogation, but at what point of his disclosures was the letter used.

Between about 2345 hours, May 18th, when he obtained the authorization to search Guerrero's and Escobedo's room, and 0400 hours, May 19th, Agent Persinger was engaged in the search; an interrogation of Escobedo at Security Police Headquarters, which produced a statement that Guerrero had hidden bricks of marihuana on the aircraft when it left Dyess Air Force Base and had been able to remove only one since their arrival at RAF Mildenhall; a search

of the aircraft, with Escobedo's assistance, which resulted in the recovery of three bricks of marihuana; and a visit to the latrine of accused's barracks to obtain marihuana Escobedo admitted he had hidden there. Escobedo had seen Persinger read the letter when he took possession of it, but at no time during the period mentioned did Persinger reveal to him any part of the text, or use any of it in his conversations with Escobedo. During the period, he made no reference to the letter or its contents to Guerrero or to Agents Dougherty or Simmons, who obtained Guerrero's first statement.

From the time of the search of his room, in all conversations with Persinger, Escobedo "from the outset . . . put all the blame onto Guerrero for smuggling the marijuana into the country." He adhered to that position in the first part of his second interrogation by Persinger, which began at about 0400 hours, May 19th. As was his practice, Persinger suspended the interrogation to confer with other agents involved in the investigation. He talked to Agent Simmons, who had been present at Guerrero's first interrogation.

Persinger was "briefed" as to Guerrero's first written statement, in which, it will be recalled, Guerrero had said Escobedo told him he had concealed two bricks aboard the aircraft, and that, at Escobedo's request, he had removed one, and helped Escobedo break it down into individual bags. Persinger apprised Simmons about "new developments." These included the aircraft search with Escobedo and "inconsistencies" between Escobedo's account of how the marihuana was brought to RAF Mildenhall and Guerrero's. Although specific inconsistencies were not inquired into, the central difference is clear: Where Guerrero attributed ownership and control of the marihuana to Escobedo, Escobedo insisted that Guerrero alone was responsible. As Escobedo testified, initially, he told Agent Persinger that the marihuana on the aircraft "was not my grass." Persinger ad-

vised Simmons that Guerrero was "probably" lying, and he asked Simmons to question Guerrero again. He did not mention Guerrero's letter or its contents, and Simmons had not heard anyone refer to the letter.

Simmons began his interrogation of Guerrero at about 0500 hours, May 19th. He recalled that Persinger entered the room more than once. Some evidence suggests Persinger may have appeared three times, but Simmons could remember only two. He thought the first visit was "early in . . . [the] interview." He was certain that when Persinger came in with Guerrero's letter, Guerrero had already been questioned for about an hour, and he had elicited from Guerrero "the major details" incorporated into the handwritten statement that Guerrero made at the end of the interview. Pertinent extracts from his testimony are as follows:

Q. [Trial counsel]. At any time throughout the course of your interview with Airman Guerrero were you aware of the existence of any letters?

A. Yes, sir.

Q. At what point in the course of the interview, between the time you initially advised him of his rights and the time that Airman Guerrero's signature was affixed to the bottom of that written statement, were you made aware of the existence of the letter?

A. Mr. Persinger came in the interview room prior to the taking of the statement with a letter.

Q. By "taking of the statement," do you mean prior to Airman Guerrero's filling out of the form itself or prior to any questioning beginning?

A. Not prior to the questioning; prior to the statement—the taking of the statement.

Q. Okay. Were there any responses on the part of Airman Guerrero that

changed after Agent Persinger made reference to a letter, if you recall?

A. No, sir.

. . . . .

Q. Okay. Were the major details that were available to you that was ultimately written in that statement available to you prior to the time that Agent Persinger came in with the letter?

A. Yes, I would say so.

. . . . .

Q. [Military Judge]. And can you recall any other conversation that—or any other statements that were made by Mr. Persinger at that time, either to Guerrero or you, or anyone else in the room, in Guerrero's presence?

A. He was in the room for a few minutes, and he did say other things. I can't specifically recall exactly what he said.

. . . . .

Q. And did he make any further mention of the letter?

A. Not to my knowledge. He didn't—to my knowledge; I haven't read the letter till [sic] yet; I didn't look at the letter; I didn't read it. Of course, things were going okay before he came in and mentioned the letter. So I figured there was no use in me knowing; if he wanted me to know what was in it, he would have, you know, shown it to me or said, "I think you need to read this," or something like this.

. . . . .

Q. Did Guerrero ever make any statements to you concerning what was in the letter?

A. No, sir.

Persinger's testimony about his visits to Guerrero's interrogation accords with that of Simmons. He stated he had tried to learn from Escobedo the "source of the marijuana" that had been aboard the aircraft, but Escobedo insisted that"all the responsibility was" Guerrero's. He went to Guerrero's interrogation, and told Guerrero that Escobedo was blaming him for smuggling in the marihuana. Persinger testified that "Guerrero said, 'If you think I'm the only one involved in it, go confront Escobedo with the eight hundred dollar loan he made.'" As Escobedo's written statement admits he gave Guerrero $805.00 toward the purchase of the marihuana, the trial judge could reasonably conclude that Persinger took up the matter with Escobedo when he resumed his interrogation of him.

Escobedo's interrogation was in two parts. The first consisted of oral questioning; the second consisted of a statement, typed by Persinger, and sworn to, and signed by, Escobedo.

Before preparation of Escobedo's written statement, Persinger went again to Guerrero. On this visit, he took with him Guerrero's letter, which had been kept in an evidence box. He testified that toward the "concluding part" of Escobedo's questioning, he had tried to get Escobedo to account for the total amount of marihuana brought onto the base. In addition to that recovered with Escobedo's assistance, he was told by Escobedo that Guerrero had given 34 ounces to a person known to him as Trapper. As one of the five bricks originally on the aircraft remained unaccounted for, he "connected" the 34 ounces given to Trapper with the reference in Guerrero's letter to "thirty-six lids." When he made that "connection," he went to question Guerrero. His account of the interrogation, as developed on cross-examination by Guerrero's counsel, is as follows:

Q. Now, did you have occasion, during the early morning hours of the 19th of May 1976, to read certain portions of that letter to Airman Guerrero?

A. Yes.

Q. And what did you tell Airman Guerrero about what you had found in the letter?

A. What do you mean, what did I tell him?

Q. What did you ___

A. I asked him for confirmation that this was a letter that he had written, since it had his return address on it. And the letter indicated his involvement in the sale of marijuana; and I asked him if he had written this particular letter; and then I further asked him for the identification of the individual to whom the letter was addressed.

Q. And did you further inform him that the letter stated that he had twenty-six lids of—or thirty-six lids of marijuana?

A. I asked him if it was true that he had dealt—or sold thirty-six lids, as the letter so indicated.

Q. And what was his reply?

A. In the affirmative.

MJ: What date was this, please, that you asked Airman Guerrero about that?

Wit: I confronted him with the contents of the letter, which indicates that he had thirty-six lids out of the kilo of grass; and I asked him if that thirty-six lids was sold by him.

MJ: Yes. What date was this that you interviewed him?

Wit: This was on the early morning hours of the 19th.

MJ: Okay. Was this the second interview that you're talking about?

Wit: Yes.

Q. Now, did you talk with him further and find out that this was the same thirty-six lids that was involved with the man named Trapper?

A. Yes.

.     .     .     .     .

MJ: Now, did you in speaking with Airman Guerrero—did Airman Guerrero relate these thirty-six lids that he mentioned in the letter to the transaction with Trapper?

Wit: Yes.

MJ: Okay.

Wit: Your honor, on the thirty-six lids, if I may, the discussion of the thirty-six lids was brought out, but the actual transfer of the quantity to Trapper was suggested by Guerrero as being thirty-four lids, rather than the actual thirty-six lids that he had developed from the kilo of marijuana.

On the basis of the foregoing testimony, the trial judge could, in my opinion, properly find that Agent Persinger did not confront Guerrero with the letter until after Guerrero had disclosed his complicity in sales of marihuana, as well as involvement in possession and use. I would, therefore, affirm his ruling that Persinger's use of the letter did not produce the incriminating parts of Guerrero's second written statement that were incorporated into the stipulation admitted into evidence.

### B. *The insignificant effect of the letter on the findings of guilty.*

Guerrero's letter did not say he had given "thirty-six lids" to Trapper to sell for him; it said only that Guerrero "got thirty-six lids out of the key," and that if he could "sell a few tonight," he might buy stereo equipment the next day. The letter is dated May 11th. The second written statement indicates Guerrero had given Trapper "about 32 ounce bags" "to sell for" him.

Guerrero was not charged with any offense arising from a transaction with Trapper. The stipulation admitted into evidence refers to the Trapper arrangement, and it states that Guerrero had "not seen or heard from Trapper since" he had turned over the marihuana to him. The trial judge instructed the court members that the Trapper evidence was to be considered "for no other purpose whatsoever" than "its tendency, if any, to prove a plan or design . . . [or] consciousness of guilt" on Guerrero's part "with respect to Specification 1." Specification 1 alleged the introduction of marihuana onto the base. In his first written statement, Guerrero had implicated

himself in that offense. I am convinced beyond a reasonable doubt, therefore, that the Trapper evidence was so inconsequential that the court members took no account of it in their findings of guilty. Consequently, whether Persinger confronted Guerrero with the letter before or after Guerrero had revealed his transaction with Trapper, the tainted evidence, if such it was, was harmless beyond a reasonable doubt.[5]

As I stated at the beginning, I would affirm the decision of the Court of Military Review as to Guerrero as well as Escobedo.

5. In any event, the evidence obtained by use of the letter applied only to specification 1. I cannot, therefore, agree with the majority's determination that all the findings of guilty as to Guerrero must be set aside.