UNITED STATES, Appellee,

v.

Jack D. RAVINE, Sergeant, U. S. Air Force, Appellant.

Dkt. No. 38,962.
ACM 22573.

U. S. Court of Military Appeals.

Aug. 10, 1981.

For Appellant: *Captain Patrick A. Tucker* (argued); *Colonel George R. Stevens, Colonel Larry G. Stephens* (on brief).

For Appellee: *Lieutenant Colonel Bruce R. Houston* (argued); *Colonel James P. Porter, Major Robert T. Mounts* (on brief).

*Opinion of the Court*

EVERETT, Chief Judge:

Appellant was tried at Hahn Air Base in Germany by a military judge sitting as a general court-martial on charges that on September 14, 1978, he had possessed 68.7 grams of marihuana while on a train and on the following day had possessed 22.08 grams of marihuana and 1.94 grams of cocaine at his private off-base apartment.[1] Sergeant Ravine pleaded not guilty and was convicted only of possessing marihuana on the train on September 14. Thereupon he was sentenced to a bad-conduct discharge, confinement at hard labor for 12 months, forfeiture of $400 pay per month for 12 months, and reduction to the grade of Airman Basic. Subsequently, the convening authority reduced the forfeitures to $279 pay per month.

The United States Air Force Court of Military Review, in affirming the conviction, concluded that a statement made by appellant to a German Customs investigator was "free and voluntary" and was sufficiently attenuated from any previous unconstitutional conduct by American military authorities to permit its admission into evidence. *United States v. Ravine*, 8 M.J. 744, 746 (A.F.C.M.R.1980). We granted review

---

1. All three drug offenses were charged under Article 134 of the Uniform Code of Military Justice, 10 U.S.C. § 934.

to consider this issue (9 M.J. 142),[2] and we affirm.

## I

On September 14, 1978, the appellant and his sister-in-law, Donna Ravine, were returning to Germany from Holland on a train. As the train was crossing the border between these two countries, they both were arrested by Mr. Jansen, a German Customs inspector. According to Jansen's testimony, after the train had departed the Emmerich Bahnhof (the train station), he conducted "a general check" of the passengers' identification and passes. At this time, he had observed the appellant sitting alone "in a closed compartment with six seats." Approximately a half hour later, he again entered the appellant's compartment to conduct a luggage check, but at this time a woman—who was later identified as the appellant's sister-in-law—had joined him in the compartment and was sitting "[a]cross from him." He had "searched the luggage of the two" and found nothing "unusual." However, while Jansen was "outside of the compartment[,] [his] eyes caught a blue traveling bag which was under a bench." Thereupon, he re-entered the compartment and "asked both whether this piece of luggage belong[ed] to them." "[A]t the same" time they "jointly" admitted "that the blue bag was theirs." Searching the blue bag, Jansen found two packages labeled L'Oreal hairdye.[3] Upon further examination of these packages he discovered that marihuana, in the form of hashish oil, had been concealed in the two small plastic bottles which would normally contain the hairdye. Of course, as Jansen later testified, when he poured the contents into the bottle's cap, he had "noticed the smell of hashish," since he was "familiar with" hashish oil.

Jansen then confiscated the contraband and took the appellant and his sister-in-law back to Emmerich in order to test the substance and "initiate other actions." After the "tests came out positive," the German Customs officials released the two suspects[4] and the evidence to the 42nd MP Customs personnel located in Emmerich. Later Jansen "went to the identification service" with Mr. Parks—the military official to whom the items had been released—and they photographed the exhibits. All of this activity occurred on September 14, 1978.

On the following day, September 15, the appellant's off-base apartment in Mittelstrimmig, Germany, was also searched by German officials. Mr. Heil, of the German Customs Investigation Office at Koblenz,[5] testified that this search was conducted

> [b]ecause ... we suspected that further evidence would be found in the apartment, and in line of this investigation I can give myself this order to search the apartment, and in our discussion with Mr. Mueller we had found already that it was necessary to search the apartment.

When the German officials arrived at the apartment to conduct the search, the appellant was not there, but subsequently he arrived. Even though initially he did not want the officials to enter his apartment, later he admitted them—apparently after Mr. Heil told him that they would enter his apartment even if they did not have his permission. The German authorities then searched the appellant's apartment and found more marihuana and some cocaine.

---

2. The precise wording of the assigned issue is: Whether prosecution exhibits 8 and 9 were improperly admitted. Prosecution exhibit 8 is appellant's statement to the German Customs investigator; exhibit 9 is the English translation thereof.

3. Jansen also found "some athletic shoes and some towels" in the blue bag, but he could not recall any of the other items that he had seen in the bag. On cross-examination, he specifically could not remember whether "there were wom-

en's undergarments and women's possessions in that blue bag."

4. The appellant's sister-in-law was released to the American military authorities because Jansen assumed that she was the appellant's wife, since she was traveling with him and their surnames were the same.

5. In that Office, Mr. Mueller was the Deputy Section Chief "for smuggling related to the forces, drugs and weapons."

Just as the Germans were completing their search, special agents of the Air Force Office of Special Investigations (OSI) arrived at the apartment. Mr. Heil testified that, "after we found the first evidence," he "called [the OSI] by telephone and asked them to come down there." However, according to Heil, "[t]hey didn't participate" in the search because "the search was almost completed when they arrived" and at that point the Germans were only "sorting out" and inventorying the incriminating items that they had found in the apartment.

After the search, the German authorities relinquished all the evidence to the OSI agents. Also, the appellant and appellant's roommate, Morrison, were turned over to the OSI agents. The appellant's brother, Wayne Ravine, and Wayne's wife, Donna—who had been arrested with the appellant the day before—were taken into custody by the German Customs officials and transported to Cochem where apparently they were confined by the German authorities. Presumably the German officials believed Wayne Ravine to be connected with the drugs found in the apartment, where he had been present when the drugs were found.[6] Moreover, unlike the appellant and Morrison, both Wayne and Donna were private American citizens living in Germany and were not service members.

Three days after the apartment search, the appellant and Morrison were interviewed by investigators at the OSI office. After being advised of his rights and having stated that he did not want a lawyer, the appellant made an oral confession to ownership of the drugs confiscated on the train and at his apartment; but he refused to give a written statement to this effect. When the appellant was "re-interview[ed]" later that same day, he was again read his rights and again asked whether he wanted to make a written statement. This time Ravine agreed to give the OSI a written

statement. According to Special Agent Okland, the appellant had told him that he had changed his mind about not giving them a written statement "[b]ecause Sergeant Morrison had made a statement to [them] in [their] interview with him." Even so, in his written statement the appellant would only admit that he owned the drugs found at his apartment. He specifically declined to make a written statement about "anything that happened at the border the previous date. He didn't want that in the statement."

According to Special Agent Okland, during both interviews on September 18, the appellant had "expressed some concern about what was going to happen to his brother," since the Germans still had him in custody. He had asked Okland "if there was any way [they] could find out if he could see his brother." Subsequently, the Germans were contacted to see if such a visit could be arranged.

On November 8, 1978, the OSI made the appellant available to Mr. Heil for questioning after he had requested an interview with the appellant. The questioning occurred at the OSI office "without United States governmental involvement."[7] Prior to the questioning, Heil had told the appellant

> that [he] had to question him concerning the entire matter once more because many items had not been clarified yet, and because the prosecutor in Kleve had asked [him] to find out whether Donna Ravine was actually [his] wife.
>
> *    *    *    *    *    *
>
> [T]hat we had to question him as a suspect ... and ... there were also questions pertaining to his brother and his sister-in-law, and as a suspect that he did not have to make a statement, but even as a witness he did not have to make any statement concerning his brother and sister-in-law.

---

6. The appellant states in his brief that "the accused's brother was apparently found in possession of drugs on 15 September 1978." We believe that this can be reasonably inferred from the record.

7. This finding was made by the court below, *United States v. Ravine*, 8 M.J. 744, 745 (A.F.C. M.R.1980), and is fully supported by Heil's testimony.

Heil further testified that he had specifically advised the appellant

> that prior to giving any statement to us he could contact an attorney, that he does not have to make a statement to us at all, that he could send us a written statement, and that if he makes a statement he could bring up all matters that would be in his favor, that would exculpate him, and [had] mentioned once more that he did not have to make any statement against his brother or sister-in-law.

Despite the prefatory warnings, the appellant "said that he was willing to make a statement also concerning his brother and sister-in-law because he was of the opinion that this could be of help to his brother." This is Heil's undisputed testimony. Thereafter, the interrogation began with Heil stating:

> Pursuant to an official request for assistance, your apartment at Mittelstrimmig, FRG, was searched by officials of the Koblenz Customs Police Office and of the State Criminal Office, Koblenz, FRG, on 15 Sep 78. The reason for the search was that you had been apprehended crossing the border coming from the Netherlands on 14 Sep 78 because approximately 160 gms of hashish oil were found in your possession.
> On 15 Sep 78, your apartment was searched for further evidence and the fruits of the search were seized.
> Can you tell us how the trip to and from the Netherlands took place?

While most of the ensuing recorded statement of the appellant—prosecution exhibits 8 and 9—primarily concerned his admitted possession of drugs on the train, the appellant also confessed to joint ownership of the drugs found in his apartment.

At the appellant's court-martial, the defense objected to the admission of any evidence seized during the search of his apartment on September 15, 1978. The military judge ruled that a telephone call from the OSI to the German authorities had "in fact instigated" the search and that, consequently, the fruits of the apartment search were inadmissible in evidence against the appellant because of the American military involvement in the search. Since the oral and written statements made by the appellant to the OSI on September 18, 1978, were also considered by the judge to be fruits of the illegal search, the appellant was acquitted of the charges which had resulted from that search.

The prosecutor maintained, however, that the statement by appellant to Mr. Heil on November 8, 1978, was not a fruit of the illegal search of the appellant's quarters or tainted in any other way. He strenuously argued that the statement had been made

> for an independent reason, an independent cause, that is to help out his brother who is in trouble. For that reason it's voluntary. It's made freely. It's made on advisement of rights. It's sufficiently removed in time and causation to dissipate any taint that might have arisen from the search of the house not complying with the 4th Amendment.

On the other hand, the defense objected to the use of this statement on grounds that it was the fruit both of an illegal search of appellant's apartment and an ensuing tainted interrogation of him by the OSI.

Ultimately, the military judge agreed with the prosecutor that the taint from those activities had been sufficiently attenuated and that the November 8 statement was a product of the appellant's free will—having been precipitated by his desire to help extricate his brother Wayne from difficulties with the German authorities. As the military judge found:

> Looking at the statement I'm persuaded it was motivated by a desire to help the brother, not by a desire to exculpate or explain his own situation. It also appears, from the information we have received, that the search itself was lawful under German law, although not lawful against the accused for court-martial purposes. Thus the situation in which the accused's brother found himself in was a perfectly lawful situation, or perfectly lawful criminal situation within the Federal Republic of German [sic], and I'm persuaded that's what motivated this statement.

■ Thus, the precise issue on this appeal is whether the November 8 confession was a result of the exploitation of the September 15 apartment search and the September 18 OSI interrogation, or whether instead, as the trial judge found, any taint from these earlier activities was so attenuated that the November 8 confession can be viewed as the product of the appellant's own free will. Of course, the United States Air Force Court of Military Review also concluded that "the accused's statement was a free and voluntary act, not tainted by the search, and was thus admissible." *United States v. Ravine, supra* at 746. We agree.

## II

One of the government's contentions on this appeal is that the trial judge erred in finding that the military authorities had "instigated" the German Customs officials to search the appellant's apartment and that the American military authorities had violated the appellant's Fourth Amendment rights.[8] However, for present purposes, we shall assume *arguendo* that the record supports the judge's determination that there was American military involvement in the search.

■ But even if the search violated the Fourth Amendment in some way, it is clear that the appellant's November 8 confession was nonetheless admissible. It is well settled that only evidence obtained from exploitation of some prior illegality is excludable as evidence. *United States v. Kesteloot*, 8 M.J. 209 (C.M.A.1980); *United States v. Waller*, 3 M.J. 32 (C.M.A.1977). In the former case we observed that "[e]vidence obtained from a source independent of the illegally obtained evidence . . . and evidence having only an attenuated connection with the illegal evidence" is properly admissible against an accused. 8 M.J. at 210.

To determine whether the evidence has been sufficiently attenuated, the Supreme Court in *Brown v. Illinois*, 422 U.S. 590, 603–04, 95 S.Ct. 2254, 2261–62, 45 L.Ed.2d

416 (1975), noted these three factors for courts to consider: "[t]he temporal proximity of the [illegality] and the confession, the presence of intervening circumstances, . . . and, *particularly*, the purpose and flagrancy of the official misconduct" (Emphasis added) (footnote omitted). Of course, as *Brown* further explains:

> The question whether a confession is the product of a free will . . . must be answered on the facts of each case. No single fact is dispositive . . . . The *Miranda* warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest. But they are not the only factor to be considered.

*Id.* at 603, 95 S.Ct. at 2261. *See Rawlings v. Kentucky*, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980); *Dunaway v. New York*, 442 U.S. 200, 218, 99 S.Ct. 2248, 2259, 60 L.Ed.2d 824 (1979).

■ In applying the attenuation test to the case at hand, we recognize initially that, before the appellant had made his recorded confession to the Germans, he was not fully advised of his Fifth Amendment rights as set forth in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). However, the *German* officials were not required to give *Miranda* warnings when they were independently conducting their own investigation. We recognized in *United States v. Jones*, 6 M.J. 226, 229 (C.M.A. 1979), that "[t]he cases are unanimous in holding that a warning is not essential to the validity of a confession which has been given in a foreign country" (quoting *United States v. Mundt*, 508 F.2d 904, 906 (10th Cir. 1974), *cert. denied*, 421 U.S. 949, 95 S.Ct. 1682, 44 L.Ed.2d 103 (1975)). As for the Federal Republic of Germany in particular, we even specifically observed in the *Jones* case that there were

> practical difficulties in implementing such a rule where a foreign interrogation is involved. Initially, we note that such

---

8. The military judge apparently concluded that there was a violation of the Fourth Amendment because the military authorities did not have

antecedent probable cause or authorization to search the apartment.

advice may be inconsistent with the law of the foreign country involved. Furthermore, government counsel has asserted in the present case, without defense objection, that the law of the Federal Republic of Germany would permit adverse comment upon the silence of an accused. Thus, an accused can actually be harmed if he is tried by a foreign court and attempts to assert his rights consistently with American law.

*Id.* at 228. We took a similar view in a case involving interrogation by Japanese authorities. *United States v. Bell,* 7 M.J. 108 (C.M.A.1979). Thus, even though the Court in *Brown v. Illinois, supra,* remarked that as to attenuation "[t]he *Miranda* warnings are an important factor," the absence of the warnings is not decisive. Indeed, in determining "whether [a] confession is obtained by exploitation of an illegal arrest," *id.,* 422 U.S. at 603, 95 S.Ct. at 2261, we find little relevance in the failure of foreign investigators to give a *Miranda* warning before taking the confession. *Cf. United States v. Jones, supra.*

Moreover, we note that in the case at hand, the German interrogator, Mr. Heil, gave the appellant various prefatory warnings which almost approximated—and in some ways exceeded—the scope of *Miranda* warnings. Not only was the appellant informed that he had a right to remain silent and to consult a lawyer; but he was also advised "that he could send [them] a written statement" and could "request that specific items of evidence should be produced in the interest of his defense." [9]

Another significant factor in determining whether the appellant's confession was obtained by exploitation of any illegality is that from his first contact with investigators and even before the search of his apartment, he always appeared ready and willing to give statements concerning suspected offenses. Thus, on the train, the appellant quickly told Jansen "that the blue bag [which contained the contraband] was theirs." After the search of his apartment, the appellant made two different statements to the OSI on the same day, even though these statements were subsequently determined to be inadmissible. Finally, the appellant made the confession now in question. This pattern of readily making statements seems very inconsistent with his claim on this appeal.

"The temporal proximity of the [illegality] and the confession,"—a factor emphasized in *Brown v. Illinois, supra*—goes directly to the heart of whether a defendant's subsequent confession is "sufficiently an act of free will to purge the primary taint of the unlawful invasion." *Wong Sun v. United States,* 371 U.S. 471, 486, 83 S.Ct. 407, 416–17, 9 L.Ed.2d 441 (1963) (footnote omitted). Here, as the lower court stated, "The statement followed the search by some 54 days and primarily concerns accused's explanation of events leading to his arrest at the German border." *United States v. Ravine, supra* at 746. The confession postdated by 51 days the appellant's tainted statements to the OSI. Furthermore, when the appellant made this confession to Mr. Heil, he was under no pretrial restraint and he had not theretofore suffered any pretrial confinement. In *Rawlings v. Kentucky, supra,* the interval between the defendant's illegal detention and his inculpatory statement was only 45 minutes, during which time the defendant was under some type of restraint, but the Supreme Court did not find this incompatible with attenuation. Here, because of the 51 or 54-day interval and because the appellant was not under custodial restraint, it is clearer than in *Rawlings* that the confession was not a product of any previous illegality. Instead, it appears that his decision to confess was "an act of free will unaffected by the initial illegality." *Brown v. Illinois, supra,* 422 U.S. at 603, 95 S.Ct. at 2261. *Cf. Wong Sun v. United States, supra.* This is all the more evident in the case at hand since the appellant's confession reveals that he answered only those questions he wanted to answer, *i. e.,* some questions he readily answered and others he refused to answer at all.

9. *See* prosecution exhibits 8 and 9—the appellant's recorded confession.

*Brown v. Illinois, supra,* further suggests that we ascertain whether any intervening circumstances broke the causal connection between the illegal activity and the challenged confession. We perceive two intervening circumstances which make it almost indisputable that the appellant acted of his own free will unaffected by the illegal search or the tainted OSI statement. In the first place, Heil testified that the appellant had "said that he was willing to make a statement also concerning his brother and sister-in-law because he was of the opinion that this could be of help to his brother." Likewise, Special Agent Okland testified that during his interview with the appellant on September 18, appellant had "expressed some concern about what was going to happen to his brother" because the Germans had him in custody. Moreover, in the confession itself, the appellant had stated that he "was again explicitly advised on [his] rights and that [he] didn't have to answer any questions concerning the matter under investigation"; but, "Inspite [sic] of this I am going to make a statement hoping this might help my brother." In the last paragraph of the appellant's confession, he further stated:

> The statement I made is true. Concluding I would like to say that it was more or less my fault that my brother must stay in a German prison today. If I had not had the contacts to the Netherlands, my brother would not have violated the German Law. In addition, I hope that my brother will soon be released from prison and that he can return to the United States.

None of these statements attributed to the appellant have ever been controverted; and, of course, as we recently observed in *United States v. Peyton,* 10 M.J. 387, 389 (C.M.A.1981):

> The appellant did not testify against the admissibility of his oral confession, even though he could have done so without fear that his testimony would be used against him to establish guilt. *Simmons*

*v. United States,* 390 U.S. 377, 389–94, 88 S.Ct. 967, [973–76] 19 L.Ed.2d 1247 (1968); para. 140a(2), Manual for Courts-Martial, United States, 1969 (Revised edition).

Accordingly, we must accept on its face the evidence that the appellant made the challenged confession in an effort to minimize his brother's drug smuggling involvement and to facilitate his brother's release from the German prison.

The second intervening circumstance was that the appellant had been told by Special Agent Okland that Morrison, his roommate, had already made a statement to the OSI. Because of Morrison's statement, the appellant apparently wanted to give his own side, too. *See United States v. Kesteloot, supra.* Thus, as in *Rawlings v. Kentucky, supra,* the evidence is so clear and undisputed that we do not have to speculate as to Ravine's motivations in confessing to the German officials.

Finally, *Brown* requires that we examine "the purpose and flagrancy of the official misconduct." 422 U.S. at 604, 95 S.Ct. 2254 at 2262, 45 L.Ed.2d 416. The involvement of the American military authorities in the search of the appellant's apartment was controverted and, in any event, was minimal.[10] We also note Heil's testimony that, pursuant to the German Customs laws, he had authority to search the appellant's apartment and the military judge's specific comment "that the search . . . was lawful under German law." Thus, in one respect the search of the appellant's apartment was completely countenanced by local law and could hardly be viewed as flagrant.

In *Brown,* the police conduct included a warrantless search of the defendant's apartment without probable cause, surprising him with drawn guns on the stairway to his apartment, and handcuffing him in transit to the station. The police had "hope[d] that something might turn up, and [defendant] confessed without any intervening event of significance." *See Dunaway v. New York, supra,* 442 U.S. at 218, 99 S.Ct. at 2259. The case at hand is com-

---

10. Ironically, at Morrison's court-martial, the same search which this military judge ruled illegal was upheld by him. *See United States v. Morrison,* 9 M.J. 683 (A.F.C.M.R.1980).

pletely dissimilar, since there is not even a scintilla of evidence that the military officials did anything to frighten the appellant into confessing. *Id.* at 220, 99 S.Ct. at 2260 (Stevens, J., concurring). Indeed, as the Court said in *Brown*, this factor is "particularly" of significance in concluding that there is no taint.

Consideration of the totality of circumstances in this case makes it clear that the appellant's confession was indeed the act of his own free will unaffected by the search of his apartment or his statement to the OSI. *Cf. United States v. Escobedo*, 11 M.J. 51 (C.M.A.1981). Of course, in reaching this conclusion, we have also observed that the appellant never has challenged the underlying voluntariness of his confession. Therefore, prosecution exhibits 8 and 9, the challenged confession in German and in English, were properly admitted as evidence.

### III

Accordingly, we affirm the decision of the United States Air Force Court of Military Review.

Judges COOK and FLETCHER concur.