**UNITED STATES, Appellee,**

v.

**Specialist Cewanee L. WASHINGTON, 423–06–7747, United States Army, Appellant.**

**ACMR 9301024.**

U.S. Army Court of Military Review.

22 April 1994.

---

For Appellant: Captain Michael A. Egan, JAGC, Captain Clement B. Lewis III, JAGC (on brief).

For Appellee: Colonel Dayton M. Cramer, JAGC, Major James L. Pohl, JAGC, Captain Gregory T. Baldwin, JAGC, Captain Joel B. Miller, JAGC (on brief).

Before WERNER, LANE, and RUSSELL, Appellate Military Judges.

## OPINION OF THE COURT

LANE, Judge:

Contrary to his pleas, the appellant was convicted by a military judge sitting as a general court-martial of receiving stolen property, in violation of Article 134, Uniform Code of Military Justice, 10 U.S.C. § 934 (1988) [hereinafter UCMJ]. The convening authority approved the adjudged sentence to a bad-conduct discharge, confinement for twelve months, forfeiture of all pay and allowances, and reduction to Private E1.

The appellant asserts, inter alia, that the military judge erred by failing to suppress evidence seized from the appellant's barracks room, because the search authorization used to support the seizure was not based on probable cause. The trial defense counsel raised the same objection, but also asserted that the search and seizure could not be found lawful under the good faith exception to the exclusionary rule, and that the three statements made by the appellant following the search were tainted by the unlawful search and were also inadmissible. We agree that the search authorization was not issued upon probable cause. Furthermore, we also hold that (1) the government failed to establish admissibility of the seized items under the good faith exception, and (2) failed to show sufficient attenuation between the three post-search statements and the tainted search.

### I. Background

During 1992 there were a number of break-ins at commissaries, shoppettes, and other Army and Air Force Exchange Service (AAFES) facilities in the Darmstadt military community. Most of these involved the theft of cigarettes. Lieutenant Colonel (LTC) Janer, commander of the 233d Base Support Battalion in Darmstadt, was concerned about these break-ins and was periodically briefed on the military police's efforts to find the perpetrators.

On 2 December 1992, military police were led to search Private First Class (PFC) Johnson's room, where they found four pairs of apparently stolen brand new boots. In a statement to the military police on 4 December 1992, PFC Johnson said that he had

purchased them from a soldier named Simmons, who had approached him and offered the boots for sale. Investigation revealed that this kind of boot was sold only at the local Military Clothing Sales (MCS) store. Records of shipments received by the MCS store via the Army Post Office (APO) revealed that some shipments were incomplete. Among the items not received were boxes of boots. At about the same time, the military police also found numerous boxes of Isotoner gloves, an AAFES resale item, in the room of a Sergeant (SGT) McBride. In both cases the items lacked price labels, indicating that they had been stolen prior to reaching the stores involved. This focused police attention on the APO.

On 8 December 1992, PFC Johnson returned to the military police and confessed that he had lied in his earlier statement. In a new statement, he said that he bought the boots from Specialist (SPC) Knight, who worked in the APO. He said that SPC Knight told him that the boots came from the mailroom, but PFC Johnson did not know if other items had been stolen from the mailroom. The following questions and answers appear in his statement and are the only references therein to the appellant.

> Q. Does anyone else know about KNIGHT and his operation besides yourself?
>
> A. Yes, another guy that works in the mailroom by the name of WASHINGTON.
>
> Q. Do you know if WASHINGTON staels (sic) anything, or buys anything himself?
>
> A. I think he's just working with KNIGHT.

This statement was finalized at 1425, 8 December 1992.

## II. The Search Authorization

At 1445, 8 December 1992, the appellant was apprehended and escorted to the military police station. He was questioned by Military Police Investigator (MPI) Rush and made a statement significant in two respects. First, he said that he had heard that SPC Knight was stealing from the mail (but had

not seen him do so) and that several people had approached him (the appellant) about buying things taken from the mail. Second, he stated that he knew "McBride." Otherwise, he denied any involvement and refused to consent to a search of his room and vehicle.

Military Police Investigator Levesque was the lead investigator for this case. He contacted a judge advocate who assisted in the wording for a search authorization for SPC Knight's room and the appellant's room and car. Military Police Investigator Levesque then sought out LTC Janer to sign the search authorization. Military Police Investigator Levesque's notes show that he made contact with LTC Janer at 1635 and that the authorization was signed at 1637. At trial, MPI Levesque stated that he had briefed LTC Janer on the phone prior to that. In issuing the search authorization, LTC Janer said he was aware that: the appellant and SPC Knight worked in the APO; PFC Johnson had bought new boots from SPC Knight; the boots were apparently stolen from an APO shipment destined for the MCS; PFC Johnson had said that the appellant was working with SPC Knight in the thefts; and that the appellant had denied involvement but indicated some knowledge of the thefts. Lieutenant Colonel Janer also considered that, in overseas areas, soldiers have only their rooms and vehicles in which to stash items they might steal.[1] Finally, it was apparent that this was an ongoing operation rather than a one-time theft, and so the perpetrators were likely to have some stolen articles in their possession.

At trial, the defense moved to suppress the items seized from the appellant's room on the grounds that the search was illegal. The testimony of MPI Levesque and LTC Janer revealed that MPI Levesque was less than complete and candid in the information he gave LTC Janer. First, he failed to relate that PFC Johnson had previously given a false statement. Then he turned PFC Johnson's statement that he thought the appellant was "just working with Knight" into evidence of criminal association even though PFC

---

1. This inference has judicial acceptance. *United States v. Lopez,* 35 M.J. 35, 39 (C.M.A.1992); *United States v. Johnson,* 23 M.J. 209, 212 (C.M.A.1987).

Johnson never said that nor was he asked to elaborate on the point.[2] Finally, he did not share the sworn statements with LTC Janer. Lieutenant Colonel Janer testified that he had a "Commander's Guide" for search authorizations which he used as "a format," but he admitted that he did not "stand there with this and pose every question on this form." He could not remember asking about the informant, saying that he "accepted what he [MPI Levesque] told me because he had the sworn statement and gave me some facts that I relied on." The following colloquy closed out the defense's cross-examination of LTC Janer.

> Q. So, in essence, sir, Investigator Levesque is someone who has briefed you before, you can count on him?
>
> A. Yes.
>
> Q. Trust him?
>
> A. Absolutely.
>
> Q. And you generally accept implicitly what he tells you?
>
> A. Yes.

Ultimately, the military judge ruled that there was probable cause, but if not, there was a proper basis for admitting the items seized under the good faith exception to the exclusionary rule.

### III. Probable Cause

 An impartial commander may authorize a search based on probable cause. Military Rule of Evidence 315(f)(2) [hereinafter Mil.R.Evid.]. Probable cause necessary for the issuance of a search authorization is a "practical, common-sense decision [that], given all the circumstances, . . . there is a fair probability that contraband or evidence of a crime will be found. . . ." *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983). While the Supreme Court in *Gates* rejected the unduly "rigid" two-prong test of *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), many factors of that test are "highly relevant in determining" probable cause. 462 U.S. at 230,

231, 103 S.Ct. at 2328, 2328–29. Among those factors are: the basis of the informant's or police officer's knowledge; the reliability of the information presented; the timeliness of the information; the specificity of the place to be searched; and the specificity of the items to be seized. U.S. Const. amend. IV; *Aguilar,* 378 U.S. 108, 84 S.Ct. 1509. We find that LTC Janer lacked information concerning both the informant's basis of knowledge and reliability. Accordingly, we hold that his search authorization was fatally defective and the items seized inadmissible at the appellant's trial.

 Two important determinations underlying a search authorization involving an informant are (1) the credibility (reliability) of the informant and (2) his or her basis for knowledge of the facts alleged. *United States v. Mix,* 35 M.J. 283, 287 (C.M.A.1992); *United States v. Moore,* 23 M.J. 295, 298 (C.M.A.1987). These determinations can be accomplished in many ways. In determining whether an informant is reliable, a commander can consider: any past reliable information provided (*Jones v. U.S.,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960)); a declaration against interest (*United States v. Harris,* 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971)); whether the informant is a private citizen coming forward with information (rather than a miscreant informing on a fellow miscreant) (*United States v. Bunkley,* 12 M.J. 240 (C.M.A.1982)); the suspect's background (*United States v. Gamboa,* 23 U.S.C.M.A. 83, 48 C.M.R. 591 (1974)); and the degree of detail in the informant's information (*Harris,* 403 U.S. 573, 91 S.Ct. 2075). Here, PFC Johnson made a declaration against interest, admitting—on 8 December 1992—that he had made a false sworn statement on 4 December 1992. However, MPI Levesque did not relay this information to LTC Janer. The only other indicator was the appellant's background, that he worked in the APO and had admitted to some knowledge of ongoing thefts that he had not reported to proper authority. Thus, LTC Jan-

---

**2.** It appears that once MPI Levesque thought PFC Johnson was being honest, he accepted whatever PFC Johnson said without any critical probing to determine the reliability of conclusory statements. Thus, MPI Levesque had little he could have told LTC Janer!

er had an insufficient basis for determining that PFC Johnson's information was reliable.

■ In determining the informant's basis of knowledge, the commander must look for facts from which to judge the validity of the informant's conclusions. He may do this by considering: the informant's personal observations (*Spinelli*, 393 U.S. 410, 89 S.Ct. 584); statements by the accused to the informant (*Gates*, 462 U.S. 213, 103 S.Ct. 2317); self-verifying facts stated by the informant (*Draper v. United States*, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959)); and other evidence that corroborates the informant's statement (*Spinelli*, 393 U.S. 410, 89 S.Ct. 584). Here, LTC Janer had only MPI Levesque's statement that PFC Johnson had admitted buying stolen boots from SPC Knight and thought the appellant was working with SPC Knight, and that the appellant had admitted hearing that SPC Knight was stealing from the APO. Had LTC Janer reviewed PFC Johnson's statement, he would have seen that this informant had provided no facts in support of his accusation against the appellant. Thus, LTC Janer also had an insufficient basis for determining that PFC Johnson's statement about the appellant had any basis in fact.

### IV. Good Faith Exception

■ Military Rule of Evidence 311(b)(3), the "good faith exception," allows evidence obtained as the result of an unlawful search to be used if the search "resulted from an authorization to search, ... issued by an individual competent to issue the authorization under Mil.R.Evid. 315(d) . . . ." Mil. R.Evid. 311(b)(3)(A). Military Rule of Evidence 315(d) provides that "[a]uthorization to search pursuant to this rule may be granted by an impartial individual," who may be a commander. Thus, a requirement of the good faith exception is that the authorizing official be "neutral and detached."[3] *Lopez*, 35 M.J. at 40. The Rule also requires that there be a "substantial basis" for probable cause and that "[t]he officials seeking and executing the authorization ... reasonably and with good faith relied on the ... authori-

zation. . . ." Mil.R.Evid. 311(b)(3)(B) and (C). Good faith is determined on an objective standard. Mil.R.Evid. 311(b)(3)(C). We find that LTC Janer, under the circumstances here, did not qualify as an impartial individual. We also find that the military police investigators did not have a substantial basis for seeking to search the appellant's room and vehicle and did not act reasonably and in good faith. Accordingly, we hold that the items seized from the appellant were not admissible under Rule 311(b)(3).

### A. Commander Impartiality

■ The role of commanders in the judicial processes of the Uniform Code of Military Justice is an important and delicate one. This court, in expressing its concern over the commander's ability to be impartial, stated that a commander's decision is subject to closer scrutiny than that of a judge or magistrate. *United States v. Thompson*, 30 M.J. 577, 579 (A.C.M.R.1990). In deciding that the military commander is not per se disqualified to serve as a neutral and detached magistrate for purposes of the Fourth Amendment, the Court of Military Appeals held that:

> [T]o the extent that the commander chooses to exercise the authority under ... the Manual for Courts–Martial by authorizing searches—a judicial function, the performance of which we must measure against Fourth Amendment standards—he must indeed be neutral and detached concerning the case in which he purports to act.

*United States v. Ezell*, 6 M.J. 307, 325 (C.M.A.1979).

■ When creating the good faith exception, the Supreme Court specifically stated that it "will also not apply in cases where the issuing magistrate wholly abandoned his judicial role . . . ." *United States v. Leon*, 468 U.S. 897, 923, 104 S.Ct. 3405, 3421, 82 L.Ed.2d 677 (1984). In the case cited as the example of such abandonment, the Court provided the underlying philosophy of the magistrate's role.

---

3. We equate the Military Rules of Evidence standard of "impartial" with the civilian standard of "neutral and detached," which is often used in military opinions.

We have repeatedly said that a warrant authorized by a neutral and detached judicial officer is "a more reliable safeguard against improper searches than the hurried judgment of a law enforcement officer 'engaged in the often competitive enterprise of ferreting out crime.'"

*Lo–Ji Sales, Inc. v. New York,* 442 U.S. 319, 326, 99 S.Ct. 2319, 2324, 60 L.Ed.2d 920 (1979) (citations omitted).

 This means that the magistrate, in authorizing the police to invade the privacy of a citizen to conduct a search for evidence or fruits of a crime, must add something to the process. That "something" is the critical review of all of the investigative material developed by the police up to the time of their request for a warrant, and the exercise of independent judgment thereon. "When a commander does not obtain 'criminal facts' from police, we will not find good faith in the face of apparent blind faith." *Thompson,* 30 M.J. at 579. The commander, to be impartial, need not be totally nonpartisan. We recognize his "ultimate responsibility for the welfare and safety of those under his command...." *Ezell,* 6 M.J. at 325. But he must meet the Fourth Amendment standard of critical review so that the search authorization is, in fact, a protection for the soldier under suspicion.

Here, LTC Janer had a guide for evaluating probable cause which would have led him to conduct this critical review had he used it properly. He, however, chose to use it only as a "format," which we take to mean that he simply relied on his memory after having read the guide once or twice. In failing to ask to see the sworn statements MPI Levesque referred to in his briefing, or to ask questions concerning the informant and his knowledge base, LTC·Janer demonstrated an uncritical approach to this important judicial duty assigned to commanders. But more importantly, his testimony that he accepted

whatever MPI Levesque told him clearly reveals that he did not add to the process. Instead, by his "hurried judgment," he acted merely as a rubber stamp for the investigators.[4]

### B. Police Good Faith

The Supreme Court premised the good faith exception on the principle that the police should not be penalized for a magistrate's error. *Leon,* 468 U.S. at 921, 104 S.Ct. at 3419. However, just as "no reasonably well trained officer" would rely on a warrant issued by a magistrate who had abandoned his judicial role, the Court said: "Nor would an officer manifest objective good faith in relying on a warrant based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" *Id.* at 923, 104 S.Ct. at 3421 (citation omitted).

In this case, the police did not act reasonably or in good faith. They failed to clarify the informant's ambiguous statement regarding the appellant's culpability, failed to develop facts surrounding the informant's basis of knowledge, and went on to provide highly exaggerated information to the commander that materially misrepresented the thrust of the informant's statement regarding the appellant. Thus, LTC Janer was not provided with a substantial basis for a warrant, but only with the hurried leap of logic of a law enforcement officer "engaged in the often competitive enterprise of ferreting out crime." *Johnson v. United States,* 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948).

### V. The Statements

### A. Facts

 The appellant remained in custody at the military police station while the search authorization was obtained and executed. After the search, the appellant was confronted by MPI Rush with respect to the items

---

4. We note that MPI Levesque contacted the legal office for help in drafting the authorization (the record being silent as to whether a judge advocate actually reviewed the predicate for such an authorization) and, in all likelihood, told LTC Janer that that office had reviewed and approved the authorization. Regardless, the Court of Military Appeals has made it clear that in these cases it is "very significant that the commander acted only after consulting the local SJA." *Lopez,* 35 M.J. at 42. Staff judge advocates must train commanders to come to them for help to (1) conduct the critical review necessary for a valid search authorization and (2) the preservation of that review for later possible litigation.

found in his room and a second sworn statement was taken. In that statement the appellant was asked to explain the items found in the search. He was also asked which of the other two soldiers, SPC Knight or PFC Johnson, was the "kingpin;" he said it was PFC Johnson.

As MPI Rush was finishing, Special Agent (SA) Zawodny of the Criminal Investigation Command (CID) arrived to question the appellant.[5] Special Agent Zawodny had no knowledge of the search and its results, and took a rather general statement from the appellant. This statement began with a question that started "You stated in your previous statement ..." The gist of the statement was how PFC Johnson stole items from the APO. After the statement was completed, the appellant was released from police custody.

The next morning, 9 December 1992, the appellant went to his company commander to discuss his case. The commander, recognizing the need to remain neutral so that he later could act in the appellant's case in a command capacity, referred him back to the CID. Thus, the appellant returned to SA Zawodny's office. SA Zawodny informed him of his rights and took another sworn statement. As before, this statement began with a reference to the previous statement. One of the main reasons for this return to CID, according to the appellant, was to set the record straight as to who was the leader in the thefts. In his first post-search statement to MPI Rush he had named PFC Johnson; now he said it was SPC Knight.

At trial the government offered only the 9 December 1992 statement. The defense contested its admission as being derivative of the unlawful search. The government contended that the statement was not derived from the search as it mainly covered the distribution of stolen items to SGT McBride several months earlier, not the items found in the search. The appellant testified that after the search, MPI Rush told him that they had found the "goods" and that he might as well come clean. He said that at that point he

felt he had no choice, and felt pressure. to confess. The military judge's ruling that the search was lawful mooted this issue, and the statement was admitted into evidence.

### B. The Taint

Evidence obtained as the result of an illegal search by a government agent is inadmissible against a person having a reasonable expectation of privacy in the place searched. Mil.R.Evid. 311(a). Under the "fruit of the poisonous tree" doctrine enunciated by the Supreme Court, evidence obtained from the exploitation of prior illegal conduct is inadmissible. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *United States v. Ravine*, 11 M.J. 325, 329 (C.M.A.1981). Evidence having only a slight, or attenuated, connection with the illegal conduct·is properly admissible. *Id.* at 329. To determine whether the evidence in question is sufficiently separated from the unlawful activity, the Supreme Court has noted three factors for consideration: (1) the temporal proximity of the evidence to the illegal conduct; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct. *Brown v. Illinois*, 422 U.S. 590, 603–04, 95 S.Ct. 2254, 2261–62, 45 L.Ed.2d 416 (1975); *Ravine*, 11 M.J. at 329. While a rights warning is a relevant factor in attenuating a statement from prior official misconduct, a warning alone cannot always break the causal connection. *Id.* In the case of multiple statements, the taint may be attenuated in a later statement only by strong evidence that the later statement was not influenced by the former statements. *United States v. Seay*, 1 M.J. 201, 204 (C.M.A. 1975); *United States v. Butner*, 15 M.J. 139, 144 (C.M.A.1983). "The preferable course" of action is to advise the suspect, in addition to the normal rights warning, that the prior statement(s) cannot be used against him. *Seay*, 1 M.J. at 204. *See United States v. Ravenel*, 26 M.J. 344, 351 (C.M.A.1988). We find the appellant's 9 December 1992 statement tainted by the illegal search, and hold its admission to be prejudicial error.

---

**5.** Due to the high dollar value of the items involved, the jurisdiction in this case was being shifted from the MPI to the CID.

We have no doubt that the statement to MPI Rush, following on the heels of the search and its revelation to the appellant, was a product of the illegal search. The statement specifically discusses the items found in that search. Moreover, this conclusion is fortified by the appellant's testimony that he made the statement because they had the goods and his only choice was to come clean. *United States v. Hamilton,* 22 U.S.C.M.A. 209, 46 C.M.R. 209 (1973). The first statement to SA Zawodny came immediately in the wake of the statement to MPI Rush, during the same period of custody, and specifically mentions the previous statement. There is no doubt that it too is tainted. The second statement to SA Zawodny, while initiated by the appellant after his release from custody, came within twelve hours of the first. It also begins with reference to the previous statements and the major reason the appellant made the statement was to correct an error in his post-search statement to MPI Rush. Special Agent Zawodny testified that he gave the appellant a standard rights warning, so there is no basis for finding attenuation through a cleansing warning. *Ravenel,* 26 M.J. at 351. The short passage of time and the lack of any evidence of some intervening circumstance to make the appellant's statement separate and apart from the illegal search means that the government has not carried its burden. *Hamilton,* 46 C.M.R. at 210.

The appellant's other assertion of error is without merit.

The findings of guilty and the sentence are set aside. A rehearing may be ordered by the same or a different convening authority.[6]

Senior Judge WERNER and Judge RUSSELL concur.

---

**6.** While our holding excludes all of the evidence seized from the appellant plus his three post-search statements, we cannot conclude that the government is foreclosed from obtaining a conviction in this case. At trial the government was preparing to (but did not) use PFC Johnson's immunized testimony against the appellant. But both he and SPC Knight could testify against the appellant. While their testimony would need corroboration, we cannot say that the government would be able to obtain such. The appellant's very first statement might even be corroborative. Thus, we choose to allow the government to decide the ultimate disposition of the specification and charge rather than dismissing them out-of-hand.