*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps
# Court of Criminal Appeals

Before
MONAHAN, STEPHENS, and DEERWESTER
Appellate Military Judges

_____

**UNITED STATES**
*Appellee*

**v.**

**Jayke T. BICKFORD**
Master at Arms Seaman (E-3), U.S. Navy
*Appellant*

**No. 202000250**

Argued 15 September 2021[1]—Decided: 29 November 2021

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judges:
Ann K. Minami (arraignment and motions)
Kimberly J. Kelly (trial)

Sentence adjudged 12 August 2020 by a general court-martial convened at Naval Base Kitsap, Washington, consisting of officer and enlisted members. Sentence in the Entry of Judgment: reduction to E-1, forfeiture of all pay and allowances, confinement for one year, and a dishonorable discharge.

---

[1] We heard oral argument in this case at American University Washington College of Law as part of our Outreach Program.

For Appellant:
*Scott R. Hockenberry, Esq.* (argued)
*Daniel S. Conway, Esq.* (on brief)
*Captain Jasper W. Casey, USMC* (on motions)

For Appellee:
*Lieutenant Jennifer Joseph, JAGC, USN* (argued)
*Major Clayton L. Wiggins, USMC* (on brief)

Chief Judge MONAHAN delivered the opinion of the Court, in which Senior Judge STEPHENS and Judge DEERWESTER joined.

————————————

**PUBLISHED OPINION OF THE COURT**

————————————

MONAHAN, Chief Judge:

Appellant was convicted, contrary to his pleas, of one specification of attempted sexual abuse of a child by communicating indecent language, in violation of Article 80 of the Uniform Code of Military Justice [UCMJ].[2]

Appellant raises two assignments of error: (1) the military judge committed error by failing to suppress Appellant's involuntary statement to Naval Criminal Investigative Service [NCIS]; and (2) the evidence is legally and factually insufficient to sustain the conviction.[3] We find no prejudicial error and affirm.

## I. BACKGROUND

### A. Appellant's Communications with "Mackenzie"

In February and March of 2019, Appellant communicated with an undercover NCIS agent posing as a 13-year-old girl named "Mackenzie" via several messaging applications and through text messages. All of these communications were captured on an NCIS device. The communications initially began

---

[2] 10 U.S.C. § 880. The act attempted would have violated Article 120b, UCMJ.

[3] We have reviewed this assigned error and find it to be without merit. *United States v. Matias*, 25 M.J. 356, 363 (C.M.A. 1987).

on a dating application where Appellant's profile contained multiple photos of himself including a photograph in uniform. The conversation quickly moved to a messaging application. At the start of the chats on that application, Appellant asked Mackenzie how old she was, and she answered she would "be 14 this yr."[4] Appellant replied he was "cool with that."[5] Appellant later asked Mackenzie if she was "good at blow jobs," and "have you done a lot of bjs,"and then told her to come over "to see if [she was] good at them."[6] Appellant also asked for Mackenzie to send an "ass pic"[7] and discussed getting condoms for when she came over to his barracks room.

Eventually Appellant and Mackenzie exchanged phone numbers and began communicating via text message. The text messages culminated on 16 March 2019, with Appellant making plans with Mackenzie for her to come to his barracks room at 1000 on Naval Base Kitsap Bangor to engage in oral sex. At approximately 0930 Appellant stopped responding to Mackenzie's messages. At approximately 1115 the NCIS agent acting as Mackenzie sent a final text message to Appellant, and then directed other agents to go to Appellant's barracks room and apprehend him.

## B. Appellant's Apprehension

Four NCIS agents subsequently went to Appellant's barracks building and obtained a key from the front desk to Appellant's barracks room. After Appellant did not respond when the agents knocked on his door and announced themselves as NCIS, the agents used the key to enter the room. The agents were wearing bullet proof vests and entered the room in a single-file tactical "stack formation" with their handguns drawn. As the lead agent entered the barracks room, he discovered that the main room was empty, but heard someone showering in the bathroom through the door to his left. The lead agent knocked on the bathroom door and yelled for Appellant to come out.

Appellant exited the bathroom wearing only a towel around his waist. The lead agent ordered Appellant to put his hands up. When he complied, the towel fell to the ground. The agents handcuffed Appellant naked. They then dressed him by pulling up his Navy Working Uniform (NWU) pants without

---

[4] Pros. Ex. 1, at 1.

[5] *Id.*

[6] *Id.* at 4–6.

[7] *Id.*

underwear, placing a NWU long sleeve undershirt over his torso and arms while his hands remained cuffed behind his back, and sliding sneakers onto his feet. At the time of the apprehension, one of the agents seized Appellant's phone from his room. The agents escorted Appellant down the stairwell of the barracks and into a waiting NCIS vehicle that took him to the NCIS office on the naval base.

NCIS did not obtain a command authorization to apprehend Appellant in his barracks room or to search or seize evidence from it. The apprehending agents neither questioned Appellant regarding any suspected offenses during the apprehension or in the subsequent drive to NCIS's office, nor physically harmed Appellant or made any degrading statements or threats towards him during the apprehension.

## C. Appellant's NCIS Interview

Approximately 15 minutes after Appellant's initial apprehension, other NCIS agents—who were not involved with the apprehension—brought him into an interview room. Appellant was no longer in restraints, and his NWU shirt was fully on, with his shoes properly on his feet. The agents asked Appellant to sit on a couch, offered him a bottle of water, asked if the room was warm enough, and invited Appellant to make himself comfortable. For the first six minutes of the interrogation the agents asked Appellant basic biographical information and engaged in rapport building by discussing his background. At the time of the interview Appellant was a 21-year-old E-3 Master-at-Arms (military law enforcement) with less than one year in the Navy. Prior to entering the Navy, Appellant had graduated from high school, completed one year of college while majoring in criminal justice, and traveled to both Europe and Africa.

One of the NCIS agents advised Appellant he was suspected of "indecent communication with a minor" and provided his Article 31(b), UCMJ, rights using the standard NCIS Military Suspect's Acknowledgement and Waiver of Rights form.[8] After reading aloud and initialing each of the rights on the form, Appellant indicated he understood each of his rights, had no questions, and still wished to give a statement. The NCIS agent asked Appellant to "just take it away" and tell her what happened.[9] Appellant then provided a statement largely consistent with the messages NCIS already possessed from its devices. Appellant described how he met Mackenzie online and how she

---

[8] Pros. Ex. 7.

[9] App. Ex. III at 15.

told him she was the daughter of a Navy chief petty officer who lived on base. Appellant stated that he initially planned to engage in sex acts with her, but then ceased communications after he realized it was wrong. Appellant admitted that Mackenzie told him that she was 13 years old and confirmed the discussions he had with her about sex.

Following these admissions, the agent requested Appellant's authorization to search his cell phone, which NCIS had seized from his barracks room, to corroborate Appellant's statements. Appellant indicated he believed the conversations were already deleted, such that the agents could not corroborate his version of events with his cell phone, but he was willing to allow NCIS to use software to try and extract the communications. Appellant signed a permissive authorization to search his phone and provided NCIS with his password. The agents then left the room.

When the agents returned, they continued to question Appellant regarding Mackenzie and elicited more details about why he did not go through with meeting her. Throughout the interview, NCIS continued the ruse that Mackenzie was an actual person. Appellant indicated that he realized what he was planning to do with Mackenzie was very wrong and illegal, and he was therefore not surprised when he was arrested. At the conclusion of the interview, Appellant drafted an apology note to Mackenzie.

The entire interview—all video-recorded—lasted approximately 90 minutes including a 15-minute break when the agents left the room to initiate the cell phone extraction. During the interview, Appellant appeared calm and able to fully understand all of the questions he was asked. The NCIS agents offered Appellant bathroom breaks, water, and an energy bar, and checked in with him to see if he was comfortable. The agents never raised their voices towards Appellant, physically harmed him, threatened him with bodily harm or punishment if he did not cooperate, or made promises to him in exchange for his cooperation. Appellant never asked to stop the questioning or asked to speak with an attorney.

**D. Procedural History**

Prior to trial, Appellant moved to suppress (1) evidence from his cell phone that was seized from his barracks room in violation of his Fourth Amendment rights against unreasonable searches and seizures, and (2) his statements made during the NCIS interview as being involuntary, as well as being fruit of the poisonous tree from the illegally seized cell phone. Correspondingly, the Government moved to pre-admit: (1) Appellant's statement to NCIS in its entirety, (2) Appellant's apology letter to Mackenzie, (3) the chats from the messaging application, and (4) the text messages between Appellant and NCIS.

The military judge who heard and decided the motions held that NCIS unlawfully seized Appellant's cell phone, and she suppressed it. However, she found the chats from the messaging application and the text messages, both of which existed on one of the NCIS devices, were admissible.

The military judge also suppressed Appellant's statements about his cell phone number and email address, which he made during the administrative questioning prior to his Article 31(b), UCMJ, rights advisement, but she admitted the remainder of Appellant's statement and his apology note to Mackenzie. She found that Appellant knowingly and voluntarily waived his rights under Article 31(b), UCMJ, and that under the totality of the circumstances his statements were voluntary. The military judge did not specifically address Appellant's Fourth Amendment fruit of the poisonous tree arguments. At trial, the Government introduced the communications between Appellant and Mackenzie, the video recording of Appellant's statements to NCIS, and Appellant's apology letter.

## II. DISCUSSION

### A. The Confession Was Voluntary

Appellant contends his statements to NCIS were involuntary based on the totality of the circumstances due to: (1) the nature of his apprehension prior to the interrogation; (2) the unlawful seizure of his cellphone and its use during the interview;[10] and (3) the deception and other tactics used during the interrogation. We disagree.

### 1. Standard of Review and the Law

Voluntariness of a confession is a question of law that we review de novo.[11]

An accused's involuntary statement is inadmissible at trial.[12] Statements are deemed involuntary if obtained "in violation of the self-incrimination

---

[10] On appeal, Appellant has limited his arguments to suppress his statements to Fifth Amendment and voluntariness grounds. However, because some of Appellant's arguments referenced Fourth Amendment violations and their impact on the voluntariness of his statement, and because the trial defense counsel moved at trial to suppress Appellant's statements as fruit of the poisonous tree in violation of the Fourth Amendment, we elect to address that issue separately below.

[11] *United States v. Lewis* 78 M.J. 447, 453 (C.A.A.F. 2019).

[12] Mil. R. Evid. 304(a).

privilege or Due Process Clause of the Fifth Amendment to the United States Constitution, Article 31 [Uniform Code of Military Justice], or through the use of coercion, unlawful influence or unlawful inducement."[13] Once the defense has made an appropriate motion or objection to the admission of an accused's statement, the government bears the burden of establishing the voluntariness of the statement by a preponderance of the evidence.[14]

When determining voluntariness, "[t]he necessary inquiry is whether the confession is the product of an essentially free and unconstrained choice by its maker. If, instead, the maker's will was overborne and his capacity for self-determination was critically impaired, use of his confession would offend due process."[15] Absent police conduct that is causally related to a confession, there is no basis for concluding a confession was involuntarily induced.[16] And even where there is a causal connection between the actions of government agents and an accused's confession, it does not automatically follow that the confession was involuntary.[17]

Courts assess voluntariness based on the totality of the circumstances, including both the characteristics of the accused and the details of the interrogation.[18] Courts look to the condition of the accused, including his health, age, education, and intelligence; the character of the detention, including the conditions of the questioning and rights warning; and the manner of the interrogation, including the length of the interrogation and the use of force, threats, promises, or deceptions.[19] The determination of voluntariness seldom turns on one factor alone, and the weight given to each factor depends on the circumstances and the accused's state of mind.[20] With regard to rights warnings, whether rights were voluntarily waived is not a separate and distinct question from the voluntariness of a statement, but

---

[13] Mil. R. Evid. 304(a)(1)(A).

[14] Mil. R. Evid. 304(f)(6)–(7).

[15] *United States v. Bubonics*, 45 M.J. 93, 95 (C.A.A.F 1996) (citing *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961).

[16] *Colorado v. Connelly*, 479 U.S. 157, 164 (1986).

[17] *Id.* n.2 (citing *Frazier v. Cupp*, 394 U.S. 731, 739 (1969)).

[18] *United States v. Freeman*, 65 M.J. 451, 453 (C.A.A.F. 2008) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)).

[19] *United States v. Ellis* 57 M.J. 375, 379 (C.A.A.F. 2002).

[20] *United States v. Jones*, 34 M.J. 899, 906 (N.M.C.M.R. 1992) (citing *Schneckloth,* 412 U.S. at 226).

rather a factor to be considered in the totality of the circumstances as to the whether the statement was voluntary. [21]

The condition of the accused based on the events preceding the interrogation is relevant to the accused's characteristics.[22] For example, in *Mincey v. Arizona*, the Supreme Court held a statement was involuntary in large part because prior to the interrogation the appellant was confined to a hospital bed with a tube in his mouth due to a gunshot wound inflicted during the course of his apprehension.[23] The Court emphasized that these conditions remained in place during the course of the interrogation, making the appellant "at the complete mercy" of the interrogator.[24] Conversely, in *United States v. Telford*, one of our sister service courts considered the totality of the circumstances and held the admissions of an appellant who was in solitary confinement for four days prior to interrogation and who claimed he had heard voices in the past to be voluntary.[25] The court found that the appellant appeared lucid and that he freely conversed with the agents during the interrogation, which was significant in its holding that his statements to law enforcement were voluntary.[26] In each of these cases, the court considered what impact the events prior to the interrogation had on the accused during the interrogation.

Additionally, ploys to mislead a suspect do not render a statement involuntary, provided they do not rise to the level of compulsion or coercion.[27] An interrogator's use of deception will not by itself render a statement involuntary.[28] Rather, it is a factor to consider under the totality of the circumstances when determining if the accused's will was overborne.[29] In *United States v. Freeman*, the Court of Appeals for the Armed Forces [CAAF] held a confession was voluntary based on the totality of the circumstances even though the

---

[21] *Id.* at 908 n.6.

[22] *See Mincey v. Arizona*, 437 U.S. 385, 399–401 (1978).

[23] *Id.*

[24] *Id.* at 399.

[25] *United States v. Telford,* No. ACM 38691, 2016 CCA LEXIS 70 at *13–18 (A.F. Ct. Crim. App. Feb. 8, 2016) (unpublished).

[26] *Id.* at *15–16.

[27] *Jones*, 34 M.J. at 906. (citing *Illinois v. Perkins*, 496 U.S. 292 (1990)).

[28] *Freeman,* 65 M.J. at 455–57.

[29] *Id.*

interrogators lied to the appellant about his fingerprints being found at the crime scene and about having witnesses who said they saw him out on the night the offenses at issue had been committed.[30] The court weighed these deceptions with the facts that, although the interrogation lasted almost ten hours, the appellant had several breaks in which he left the interrogation room, went outside and smoked.[31] He was also provided water and declined offers for food and other drinks. He was neither physically abused nor threatened with such abuse, and although he made admissions to law enforcement agents before he prepared his written statement, he prepared the statement himself, outside the presence of any investigator.[32]

*2. Appellant's Characteristics and the Details of the NCIS Interview Made His Statements Voluntary*

Appellant's characteristics and his condition, even taking into account the circumstances of his apprehension, did not render his statements involuntary. At the time of the interview, Appellant was a 21-year-old E-3 with approximately one year in the Navy. He was able to read and understand his rights during the course of the interview and was not suffering from any mental defect. Appellant was a Master-at-Arms and had completed one year of college while majoring in criminal justice. From this we can infer that he possessed an above-average understanding of the military justice system and his rights at the time of the interview.

We concur with Appellant that there are some concerning aspects of his apprehension that may have impacted his condition at the outset of the interrogation. While we are not in a position—outside our legal rulings—to dictate the manner in which NCIS or law enforcement should conduct an apprehension, some of the agents' actions here seemed wholly unnecessary. Even if NCIS standard operating procedures require agents to enter an individual's room to complete an apprehension (for this sort of alleged non-violent misconduct, no less) with guns drawn and in stack formation, there seems little cause to handcuff a compliant suspect while he is completely nude. Moreover, once the four agents secured the room for any weapons, and Appellant continued to comply with the agent's commands, the record is

---

[30] *Id.* at 456.

[31] *Id.*

[32] *Id.* at 457.

unclear as to why Appellant was not permitted to dress himself with underwear and put shoes on properly.[33]

Despite the circumstances of the apprehension, however, Appellant appeared calm and collected as he entered the interview room approximately 15 minutes later. He showed no outward signs of distress at the start of the interview. While being apprehended in such a manner could certainly be a traumatic experience, so too perhaps are all unexpected apprehensions. The facts of this case are far afield from an interview conducted while the accused is still suffering from a recent gunshot wound in the hospital, or even, for that matter, an interview following four days of solitary confinement. Therefore, despite the tumultuous circumstances of Appellant's apprehension, his characteristics and condition weigh in favor of a finding of voluntariness.

Moreover, the details of the interview demonstrate that Appellant's statements to NCIS were voluntary and not the result of governmental overreach. Throughout the course of the interrogation, Appellant appeared calm, lucid, and fully communicative. He was properly advised of each of his Article 31(b), UCMJ, rights, and waived them after indicating he fully understood them and had no questions. Given his training, experience, and education, we infer he understood these rights better than the average Sailor. Additionally, the interviewing agents—who were not the agents who apprehended him—addressed Appellant respectfully. The agents neither raised their voices nor made any threats or promises to him. The agents frequently confirmed Appellant was comfortable, and the interrogation itself lasted only approximately 90 minutes, which included multiple breaks.

Appellant argues the apprehending agents' aggressive actions, juxtaposed to the interrogating agents' calm approach, amounted to a "Mutt and Jeff" tactic similar to the one employed in *United States v. Bubonics*. We disagree. When the appellant in *Bubonics* failed to confess to an allegation, a supervisory military interrogator yelled and threatened to turn him over to civilian authorities.[34] CAAF held that these actions, coupled with the appellant's relatively junior status and likelihood to feel compelled to answer questions from more senior military interrogators, overcame his will.[35] That is not what

---

[33] Under a different set of facts concerning the suspect to be apprehended—that would not necessarily be apparent to the NCIS agents at the time—these tactics might very well result in a subsequently involuntary statement.

[34] *Bubonics*, 45 M.J. at 96

[35] *Id.*

occurred here. First, the apprehending agents were not in the room during the interview, and no reference was made to their actions during the questioning. Even if we consider the apprehension as a tactic of the subsequent interview, the apprehending agents never threatened or berated Appellant. There is also no evidence NCIS purposefully conducted the arrest to "soften up" Appellant for his subsequent interrogation. There may be factual scenarios in which law enforcement's actions during an apprehension are so egregious as to render statements made during a non-threatening interrogation shortly thereafter involuntary; however, this is not such a case.[36]

Moreover, the facts do not support Appellant's argument that the interviewing agents used their possession of his cell phone to overcome his will. While Appellant knew that NCIS had seized his phone during the apprehension, the interviewing agents made no reference to the phone prior to Appellant admitting every element of the offense. Rather, the lead interviewing agent gave an open-ended invitation for Appellant to "just take it away," and he did.[37] Appellant also went on to say later in the interview that he believed any evidence on his phone was no longer there because he had deleted it all. He told the agents this in the context of trying to validate the truth of the statements he had already made to them. The interviewing agents never referenced the contents of the cell phone or used them to attempt to coerce Appellant into making a statement.

The interviewing agents' use of deception was permissible and did not make Appellant's statement involuntary. Specifically, the fact that the interviewing agents' continued to mislead Appellant into thinking that Mackenzie was an actual 13-year-old girl did not make his statement involuntary. Law enforcement agents are permitted to deceive a suspect about the state of the evidence or the status of a victim during the course of an interrogation, provided such tactics do not rise to the level of compulsion or coercion.[38] Here, the agents informed Appellant during his rights advisement that he was suspected of indecent communication with a minor. Then, after he waived his rights and prior to asking him to provide his

---

[36] This is not to suggest that we endorse the tactics employed by the apprehending agents. Absent the reasonable actions of the interviewing agents and Appellant's training and experience, we may very well have reached a different conclusion here. *See supra* note 33.

[37] App. Ex. III, at 15–16.

[38] *Jones*, 34 M.J. at 907.

version of events, one of the agents said to him, "Okay. So obviously what we want to talk to you about is your discussion with a girl . . . ."[39] We find that such deception did not rise to the level of compulsion or coercion and, thus, did not impact the voluntariness of Appellant's subsequent confession.

Lastly, throughout the videotaped interrogation Appellant was calm and cooperative, and appeared to be making the statements of his own free will. Thus, under the totality of the circumstances we find, as did the military judge, that Appellant's statements to NCIS were voluntary.

## B. Appellant's Statements Were Not Obtained in Violation of His Fourth Amendment Rights

At trial, Appellant moved to suppress his statements on the additional grounds that they were fruit of the unlawful seizure of his phone in violation of his Fourth Amendment rights. The military judge who heard and decided the motions ruled on this issue by admitting the statements and suppressing the evidence from the phone. On appeal, Appellant argues his statements to NCIS were involuntary because NCIS unlawfully entered his barracks room to apprehend him and unlawfully seized his phone, but he argues these are only factors to be considered vis-à-vis the voluntariness of the statements, as discussed above in Section II.A. However, there is significant overlap between Fourth and Fifth Amendment protections when assessing whether allegedly unlawful police activity renders a subsequent statement admissible.[40] Moreover, Article 66, UCMJ, places with this Court an "affirmative obligation to ensure that the findings and sentence in each . . . case are correct in law and fact . . . and should be approved."[41] We therefore find it necessary to address Appellant's argument to the trial court that his statements should be suppressed as fruit of unlawful NCIS activity in violation of the Fourth Amendment.

---

[39] App. Ex. III, at 15.

[40] *See Brown v. Illinois*, 422 U.S. 590, 601 (1975) (holding that even if statements are found voluntary under the Fifth Amendment, the Fourth Amendment requires analysis of the causal chain after an illegal arrest to determine whether a subsequent statement "is sufficiently an act of free will to purge the primary taint") (quoting *Wong Sun*, 371 U.S. at 486).

[41] *United States v. Chin* 75 M.J. 220, 223 (C.A.A.F. 2016) (internal quotation omitted).

### 1. Standard of Review and the Law

"We review a military judge's ruling on a motion to suppress evidence for an abuse of discretion, viewing the evidence in the light most favorable to the party prevailing below."[42] As such, we review the military judge's findings of fact for clear error but her conclusions of law de novo.[43]

The Fourth Amendment protects against unreasonable searches and seizures and provides that warrants shall not be issued absent probable cause.[44] Fourth Amendment protections extend to warrantless arrests as well if they occur in an area with a reasonable expectation of privacy.[45] Military Rule of Evidence [Mil. R. Evid.] 311 codifies the Fourth Amendment's exclusionary rule. The Rule provides that evidence obtained as the result of an illegal search or seizure by a government agent is inadmissible against a person having a reasonable expectation of privacy in the place searched, if exclusion of the evidence results in appreciable deterrence of future unlawful searches and seizures, and the benefits of such deterrence outweigh the costs to the justice system.[46]

Servicemembers have a reduced reasonable expectation of privacy in their barracks rooms.[47] Rule for Courts-Martial [R.C.M.] 302(c) allows for a person subject to the UCMJ to be apprehended when there is probable cause (reasonable grounds to believe) that an offense has been or is being committed and that the person being apprehended committed or is committing it.[48] R.C.M. 302(e)(2) provides that a military barracks room is not a private dwelling. Therefore, a warrantless apprehension based only on probable cause is authorized at such a location.[49] However, when the government's

---

[42] *United States v. Hoffman*, 75 M.J. 120, 124 (C.A.A.F. 2016) (citation omitted).

[43] *Id.*

[44] U.S. Const. amend. IV.

[45] *United States v. Khamsouk*, 57 M.J. 282, 287 (C.A.A.F. 2002) (citing *Payton v. New York*, 445 U.S. 573, 585–86 (1980)).

[46] Mil. R. Evid. 311(a).

[47] *United States v. McCarthy,* 38 M.J. 398, 403 (C.M.A. 1993).

[48] R.C.M. 302.

[49] *See McCarthy*, 38 M.J. at 403–04.

primary purpose in entering a barracks room is to seek evidence of a crime,[50] law enforcement must seek proper authorization[51] or consent for the search,[52] absent exigent circumstances.[53]

The "fruit of the poisonous tree" doctrine bars evidence obtained from the exploitation of prior Fourth Amendment violations.[54] However, under this doctrine, "[e]vidence having only a slight, or attenuated, connection with the illegal conduct is properly admissible."[55] The question is whether the evidence was gained by "exploitation of that illegality or instead by means sufficiently distinguishable to be purged by the primary taint."[56] To determine the admissibility of the subsequently obtained evidence, the Supreme Court in *Brown v. Illinois* provided three factors for consideration: (1) the temporal proximity of the evidence to the illegal conduct; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct.[57] While a rights warning is an intervening circumstance attenuating a statement from prior official misconduct, a warning alone does not always break the causal connection between the illegal action by law enforcement and subsequent statements by an appellant.[58]

The third factor is "'particularly' important . . . because it comes closest to satisfying the deterrence rationale for applying the exclusionary rule."[59] "The third factor . . . favor[s] exclusion only when the police misconduct is most in need of deterrence—that is, when it is purposeful or flagrant."[60] "For the

---

[50] *See United States v. Jackson*, 48 M.J. 292, 294 (C.A.A.F. 1998) (enunciating that a unit inspection under Mil. R. Evid. 313 primary purpose must be for unit readiness and not to obtain evidence of crimes).

[51] Mil. R. Evid. 315(d),(f).

[52] Mil R. Evid. 314(e).

[53] Mil. R. Evid. 315(g).

[54] *United States v. Washington*, 39 M.J. 1014, 1021 (A.C.M.R. 1994) (citing *Wong Sun v. United States*, 371 U.S. 471 (1963); *United States v. Ravine*, 11 M.J. 325, 329 (C.M.A. 1981)).

[55] *Id.*

[56] *Wong Sun*, 371 U.S. at 488.

[57] *Brown v. Illinois*, 422 U.S. at 603–04.

[58] *Id.*

[59] *Khamsouk*, 57 M.J. at 291 (quoting *New York v. Harris*, 495 U.S. 14, 23 (1990)).

[60] *Utah v. Strieff*, 579 U.S. 232, ___, 136 S. Ct. 2056, 2063 (2016).

violation to be flagrant, more severe police misconduct is required than the mere absence of proper cause for the seizure."[61] It is not necessary for law enforcement's actions to be "outrageous" for the third *Brown* factor to apply.[62] However, regardless of what type of unlawful conduct law enforcement committed, or the evidence subsequently obtained, the focus of the third factor remains on whether the law enforcement agents exploited the initial illegality.[63]

*2. Appellant's Statements Were Properly Admitted at Trial Because They Were Not a Result of an Exploitation of Unlawful Police Actions*

The military judge found the agents' entrance into Appellant's barracks room was "unlawful" and "excessive," as was the warrantless seizure of his cell phone. She therefore suppressed the cell phone and its contents to deter further government misconduct. While we find the agents entered the barracks room lawfully to conduct the apprehension, we concur they lacked proper authorization to seize Appellant's cell phone.

Under R.C.M. 302(e), NCIS's apprehension of Appellant was lawful. NCIS required only probable cause that Appellant committed an offense to enter his barracks room to apprehend him. Based on the messages exchanged between Appellant and Mackenzie discussed above, NCIS possessed evidence far beyond what was necessary to establish probable cause that Appellant committed attempted sexual abuse of a child. R.C.M. 302(d) goes on to state that an apprehending agent "may use such force and means as reasonably necessary under the circumstances to effect the apprehension." While we question the necessity of certain actions of the apprehending agents, we need not address whether those actions constituted a violation of R.C.M. 302(d), provided we find the apprehending agents' actions were sufficiently attenuated from Appellant's statements to NCIS.

We must also analyze whether the apprehending agents violated Appellant's Fourth Amendment rights when they seized his cell phone from his barracks room. There are certainly situations when military authorities may seize evidence from a barracks room without a search authorization. For instance, they may seize evidence that is discovered during an unannounced

---

[61] *Id*. at 2064.

[62] *United States v. Darnall*, 76 M.J. 326, 331–32 (C.A.A.F. 2017).

[63] *United States. v. Conklin*, 63 M.J. 333, 340 (C.A.A.F. 2006).

inspection[64] or that is discovered in connection with a warrantless entrance to offer emergency aid and which was not the result of a search for incriminating evidence.[65] However, R.C.M. 302, which permits warrantless apprehensions in barracks rooms, does not allow law enforcement to circumvent Fourth Amendment protections by actively searching for evidence relating to the crime for which they are apprehending a suspect. If the rule were otherwise, the government could purposefully conduct apprehensions in barracks rooms as subterfuges to search for evidence without seeking authorization or consent. Here, Appellant possessed a reasonable expectation of privacy in his barracks room that required NCIS to obtain a search authorization under Mil. R. Evid. 315 or consent to search for and seize his phone.

Although evidence from Appellant's cell phone was suppressed, and assuming arguendo that his apprehension also violated the Fourth Amendment due to excessive use of force, we find that his subsequent statements to NCIS were sufficiently attenuated from any NCIS misconduct. Thus, we find those statements were admissible.

Applying the first *Brown* factor, the temporal proximity of the evidence, we acknowledge that Appellant began making his statements to NCIS only 15 minutes after his apprehension and seizure of his phone. Therefore, this factor weighs in favor of Appellant.

Next, we consider the second *Brown* factor, the presence of intervening circumstances. The NCIS agents who participated in the apprehension were not the ones who provided Appellant's Article 31(b), UCMJ, rights warnings or conducted the interview, and the location of the interview was different from the location of Appellant's apprehension. These are both intervening circumstances that attenuate the taint from the apprehension and seizure of the phone. Moreover, despite the fact that only a short period of time had passed since his apprehension, Appellant was properly informed of his Article 31(b) rights, acknowledged that he understood them, voluntarily waived

---

[64] *United States v. Montero,* No. ARMY 9701328, 1999 CCA LEXIS 422 (Army Ct. Crim. App. Aug. 10, 1999) (unpublished) (holding that an unannounced inspection based on a noise complaint where the inspector smelled marijuana and subsequently searched for a seized the marijuana did not violate the soldier's Fourth Amendment protections).

[65] *United States v. Curry*, 46 M.J. 733, 741 (N-M. Ct. Crim. App. 1997).

them, and appeared calm throughout his recorded interview.[66] Therefore, the second factor weighs in favor of the Government.

Finally, the third and most critical *Brown* factor, the purpose and flagrancy of the official misconduct, weighs in favor of the Government when considering the potential taint from the unlawful apprehension. Assuming the apprehension violated his Fourth Amendment rights, there is no evidence that NCIS designed the apprehension to gain any investigative advantage. There is simply no indication that the aggressive manner of the apprehension was intended to "soften up" Appellant to confess during the subsequent interrogation.

As to the potential taint from the unlawful seizure of the cell phone, the third factor weighs again in favor of the Government. NCIS did not exploit the phone's contents in order to compel or coerce Appellant's statements during the course of the interrogation. The unlawful seizure of the cell phone was not designed to achieve an investigatory advantage, and the agents did not review the contents of the phone prior to questioning Appellant. Additionally, the agents did not discuss the phone until after Appellant provided a full confession to every element of the offense.

Unlike the circumstances in *United States v. Washington*, where our sister service court suppressed statements made by the appellant following an illegal search,[67] the NCIS agents in this case never confronted Appellant with the unlawfully obtained evidence. The agents never stated or implied that Appellant should confess because they already possessed the phone. In fact, the evidence demonstrated Appellant actually believed that there was no evidence of the crime remaining on the cell phone. Moreover, because the agents elected to continue the ruse that Mackenzie was an actual minor, they never confronted Appellant with the communications that were already in their possession from the sting operation. Thus, although the seizure of the phone was unlawful, the suppression of the cell phone and its contents was the sole appropriate remedy. Unlawfully obtained evidence does not render all later statements fruit of the poisonous tree when the police misconduct or the unlawfully obtained evidence in no way impacts a suspect's subsequent statement. Regardless of the length of time or intervening circumstances,

---

[66] While such rights warnings may not be sufficient, by themselves, to attenuate the taint of prior unlawful action, they are "an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest." *Brown*, U.S. at 603.

[67] *United States v. Washington*, 39 M.J. 1014, 1021–22 (A.C.M.R. 1994).

there must be some exploitation of the unlawfully obtained evidence. Here, we find none.

## III. CONCLUSION

After careful consideration of the entire record of trial, the briefs from both parties, and their presentations at oral argument, we have determined the findings and sentence are correct in law and fact and find no error materially prejudicial to Appellant's substantial rights occurred. Accordingly, the findings and sentence are **AFFIRMED**.

Senior Judge STEPHENS and Judge DEERWESTER concur.

FOR THE COURT:

RODGER A. DREW, JR.
Clerk of Court